JOHN J. STOIA, JR. (141757)
RACHEL L. JENSEN (211456)
THOMAS R. MERRICK (177987)
PHONG L. TRAN (204961)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
johns@rgrdlaw.com
rachelj@rgrdlaw.com
tmerrick@rgrdlaw.com
ptran@rgrdlaw.com

Class Counsel

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GROUPON MARKETING AND SALES PRACTICES LITIGATION | Case No.  3:11-md-02238-DMS-RBB |
| | **DECLARATION OF JOHN J. STOIA, JR. IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Date:          September 7, 2012 |
| | Time:          1:30 p.m. |
| | Judge:        Hon. Dana M. Sabraw |
| | Courtroom:  10 |

I, John J. Stoia, Jr., hereby declare as follows:

1.     I, John J. Stoia, Jr., am an attorney duly licensed to practice before all the courts of the State of California and the Southern District of California.  I serve as of counsel to the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Class Counsel").  I submit this declaration in support of the parties' Joint Motion for Final Approval of Class Action Settlement.  I have personal knowledge of the matters stated herein and, if called upon, could and would competently testify thereto.

2.     On June 24, 2011, the Court appointed my firm and me to serve as Interim Class Counsel to conduct and coordinate this multi-district litigation ("MDL") on behalf of Plaintiffs and the putative Class, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure ("June 24, 2011 Order") (Dkt. No. 10).  The Court appointed my firm and me to serve as Class Counsel for the Settlement Class in its order preliminarily approving the Settlement Agreement.  *See* Order Preliminarily Approving Class Action Settlement, dated April 24, 2012 (Dkt. No. 42).

## I.     Plaintiffs' Claims

3.     Having investigated and researched the allegations of the complaint and conducted extensive analyses of the facts, law and related issues, my firm and I were in an excellent position to fully evaluate the strengths and weaknesses of Plaintiffs' claims and Defendants' defenses.

4.     In these cases, Plaintiffs assert class claims based on federal and state law arising out of Defendants' marketing and sale of Groupon Vouchers, alleging, *inter alia*, that the expiration dates stated on Groupon Vouchers during the class period violate the Electronic Funds Transfer Act ("EFTA"), as amended by the Credit Card Accountability Responsibility and Disclosure Act ("CARD Act"), 15 U.S.C. §1693, *et seq*., and various state laws.  Specifically, Plaintiffs allege that the CARD Act prohibits the sale of gift certificates with expiration periods of less than five years and that the CARD Act's provisions apply to Groupon's Vouchers.  Plaintiffs allege that the inclusion of expiration dates on Groupon Vouchers also violates a number of state laws that apply to the expiration dates of gift certificates.  Plaintiffs seek damages, restitution, injunctive relief, and other remedies in the Actions.

## II.  Defendants' Anticipated Motion to Compel Arbitration and Arbitration-Related Discovery

5.     Defendants have always strongly asserted in this Action that Plaintiffs' claims concerning Groupon Vouchers are subject to mandatory arbitration and class action waiver provisions.  Defendants claimed that Plaintiffs and all Class Members explicitly agreed to individual arbitration and waived their right to proceed through class action when they purchased their Vouchers through the internet or mobile phones and "clicked through" Groupon's terms and conditions containing those provisions.  Defendants further claimed that the arbitration and class action waiver provisions are binding and enforceable, pursuant to the U.S. Supreme Court's recent decisions in *AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S. Ct. 1740 (2011), and *CompuCredit Corp. v. Greenwood*, __ U.S. __, 132 S. Ct. 665, 669 (2012).

6.     During a case management conference on June 23, 2011, defense counsel, Shirli Weiss of DLA Piper LLP (US) ("Ms. Weiss" or "Defense Counsel"), advised the Court of Defendants' intention to move to compel Plaintiffs to mandatory individual arbitration based on the existence of mandatory arbitration and class action provisions in Groupon's terms and conditions.  The Court authorized the parties to conduct discovery in advance of the Defendants' motion to compel arbitration and ordered the parties to prepare a joint discovery plan.  *See* Order Setting Dates (Dkt. No. 11).

7.     Thereafter, the parties negotiated a discovery plan for arbitration-related discovery. On July 1, 2011, the parties submitted their joint discovery plan to the Court.

8.     In accordance with the joint discovery plan, the parties subsequently exchanged arbitration-related discovery on July 11, 2011.  My firm prepared and served Groupon with 18 interrogatories and 25 document requests, and served three Merchant Defendants with requests for admission.

9.     Defendants likewise propounded 16 sets of interrogatories on Plaintiffs, totaling 186 individual interrogatories, and 16 sets of document requests, totaling 304 individual requests.

10.     The parties served their responses to the arbitration-related discovery requests on August 1, 2011.  To accomplish this goal, my firm coordinated all Plaintiffs and their counsel to

prepare and serve 460 individual responses to Defendants' discovery requests on behalf of 16 Class Representatives.

11.     Additionally, my firm engaged in several lengthy meet-and-confer efforts with Defendants concerning the parties' arbitration-related discovery and disputes relating thereto. Further, Plaintiffs produced more than 900 pages of documents.   Defendants also produced documents.

12.     The parties also met and conferred concerning the taking of depositions of the parties as part of the arbitration-related discovery.

**III.     The Parties' Settlement Negotiations with the Assistance of Judge Weinstein**

13.     My firm engaged in hard-fought, arms-length settlement negotiations with Defense Counsel spanning nearly a year.  Our negotiations were undertaken under the direct supervision and with the active participation of the Honorable Daniel Weinstein (Ret.) of JAMS.

14.     Following multiple telephonic settlement meetings, we agreed with Defense Counsel to submit the dispute to mediation.  Thereafter, the parties submitted settlement briefs to Judge Weinstein and attended an all-day mediation session on May 17, 2011, during which we were able to narrow the issues substantially but were nevertheless unable to reach resolution.

15.     After the mediation, we continued to negotiate with Defense Counsel concerning the terms of settlement by way of innumerable telephonic conferences and other exchanges between my firm and Ms. Weiss, as well as with Judge Weinstein both one-on-one and together, which efforts ultimately led to an agreement in principle in August 2011, with the exception of Plaintiffs' attorneys fees and expenses.  The parties agreed to refrain from negotiating attorneys' fees and expenses, or Plaintiffs' incentive awards, until all other terms of Settlement were set.

16.     Upon finally reaching agreement on the terms of Settlement, the parties subsequently drafted and negotiated the Settlement Agreement, exchanging over a dozen versions of the Stipulation and the 11 settlement exhibits, including the class notice, claim form, notice and claims administration program, and settlement vouchers, as well as the proposed order approving settlement and the accompany proposed final judgment.

17.     Throughout the negotiations process, we frequently consulted Judge Weinstein on various issues, including the monetary and injunctive relief, the claims administration process, and the form of notice.  During the Fall of 2011, we hit a significant roadblock in our negotiations with Defense Counsel and reached impasse.  Only due to Judge Weinstein's guidance and assistance were we able to bridge the gap and resolve all the material issues in the draft Stipulation.  Thus, the parties were able to achieve what was ultimately the subject Settlement Agreement filed with, and preliminarily approved by, this Court.

## IV.     This Settlement Is Reasonable, Fair and Adequate Taking into Account the Relevant Factors

18.     As to the strength and weaknesses of Plaintiffs' claims and Defendants' defenses, this Action is not unique in that the Parties disagree about every material aspect of the merits, including but not limited to, whether Plaintiffs' claims can be litigated at all or are subject to mandatory individual arbitration provisions; whether Defendants violated federal or state law as alleged by Plaintiffs; and the existence of alleged damages.  Though Plaintiffs believe that they have valid claims, they recognize the risk that Groupon could compel them to time consuming and costly individual mandatory arbitration in the wake of *Concepcion* and *CompuCredit*, thus foreclosing ***any relief*** to the Settlement Class on a classwide basis.

19.     Defendants have taken the position that statutory damages in a class action arising out of an EFTA violation are capped to the *lesser* of $500,000 or 1% of Defendant's net worth.  We dispute the application of a cap to Plaintiffs' claims and argue that the EFTA's cap would apply, if at all, to each violation, *i.e.*, each "Daily Deal" offered by Groupon.

20.     Defendants contend that, while the various state statutes that Plaintiffs argue apply to Groupon Vouchers differ, with some imposing no restrictions on gift cards and others imposing restrictions, and while the definition of gift cards varies with respect to their application to Groupon Vouchers, consumers were informed that the expiration date of the Customer Purchase Price value of a Groupon Voucher was tied to the state law of the state in which it was sold.  We disagree and contend that Groupon's small print was inadequate to put consumers on notice that the Vouchers did not expire on the date provided on their face.

21.     For a variety of reasons, there was substantial uncertainty about the ultimate outcome of this litigation absent settlement.  However, we understand that Plaintiffs face the *certainty* that further litigation would be expensive, complex and time consuming.  The parties anticipate the need for complicated litigation on a number of issues, including whether the claims can be litigated or are subject to arbitration for an individual case.  Assuming that the Court were to determine that Plaintiffs' claims are not subject to arbitration, extensive discovery on class certification and the merits of Plaintiffs' claims and Groupon's defenses would be required. There is no doubt that continued litigation would be expensive, complex and time consuming.

22.     For this Settlement, Merchant Partners are required to play an active role in providing relief to the Class.  The Settlement Agreement provides: "Within seven (7) days of the Effective Date, Groupon will notify all past and current Merchant Partners through means and content reflected in Exhibit 10 that they may be presented with Settlement Vouchers and requesting that they redeem all Settlement Vouchers presented by Settlement Class Members presented within 130 days of the Settlement Voucher's Issue Date."  (Settlement Agreement, §E.2.)  After signing the Settlement Agreement, however, the Parties agreed, subject to Court approval, to a minor modification of that arrangement, replacing the language above with the following language: "Groupon will notify all past and current Merchant Partners of the Settlement.  As the Settlement Vouchers are issued by the Claims Administrator in response to Class Member Claims, Groupon will send notice through means and content reflected in Exhibit 10 to potentially impacted Merchant Partners and request that they redeem all Settlement Vouchers presented by Settlement Class Members within 130 days of the Settlement Voucher's Issue Date."

23.     Prior to reaching this Settlement, the Parties engaged in formal and informal discovery regarding arbitration, permitting them to assess the relative strengths and weaknesses of their respective positions, and to compare the benefits of the proposed Settlement Agreement to further litigation. Defense Counsel and I both have substantial experience in litigating class actions, zealously negotiated on behalf of their respective clients' best interests, and a settlement was reached only after multiple settlement proposals had been exchanged and rejected.

24.     I believe and represent to this Court that the Settlement Agreement is fair, reasonable, and adequate, which weighs in favor of a finding that the Settlement Agreement is fair.

25.     Many of the minimal number of objections have been filed by professional objectors who routinely appear in class actions in the hopes that they may hold up the settlement here, or in the Court of Appeals, for their own pecuniary gain.

26.     My firm has posted Notice of the Settlement and other Settlement documents on the firm website for Class Members to review and make inquiries about the Settlement.

## V.     Redemption Rates for Daily Deal Vouchers

27.     Members of my firm and I have researched the redemption rate for gift cards and "Daily Deal" vouchers, such as Groupon Vouchers.  We were unable to find definitive data on the redemption rates for Groupon Vouchers, or for the Daily Deal industry as a whole, but we came across various industry articles that put non-redemption rates (percentages of purchases of gift cards left unredeemed) in the range of 5% to 20%.  For example, in an August 25, 2010 article from Ad Age's website, Groupon's former President and Chief Operating Officer Rob Solomon is quoted as saying redemption rates are "north of 80% for the average Groupon."[1]  Also, a January 24, 2011 article from Cnet.com states that around 5% to 7% of gift cards go unredeemed and unclaimed each year.[2]

28.     Attached hereto as Exhibit A is a true and correct copy of the August 25, 2010 article from AdAge.com.

---

[1]     http://adage.com/article/digital/groupon-preps-national-marketers-gap-promo/145552/
[2]     http://news.cnet.com/8301-13772_3-20029410-52.html

1       29.     Attached hereto as Exhibit B is a true and correct copy of the January 24, 2011

2  article from Cnet.com.

3       I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.  Executed this 10 day of August, 2012, at San Diego, California.

5

6

7                              JOHN J. STOIA, JR.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

## <u>EXHIBITS TO DECLARATION OF JOHN STOIA</u>

| <u>EXHIBIT TAB</u> | <u>PAGE NOS.</u> |
| --- | --- |
| EXHIBIT A | 1 |
| EXHIBIT B | 2-3 |

# EXHIBIT A

# AdvertisingAge®

## GROUPON PREPS FOR MORE NATIONAL MARKETERS AFTER $11 MILLION GAP PROMO
### Touts Ability to Generate Foot Traffic as Key

By Natalie Zmuda

*Published:* August 25, 2010

NEW YORK (AdAge.com) -- It looks like Groupon will be topping retailers' holiday wish lists.

Since last week's national Gap promotion, Groupon's phones have been ringing off the hook, said Rob Solomon, president-chief operating officer of Groupon. He expects the company's next national retail promotion will happen "pretty soon," with more to come during the fourth quarter.



Gap's Groupon sold 441,000 units for more than $11 million.

"The goal is traffic, so you'll see a bunch in" the fourth quarter, he said. "We proved that we can drive traffic in spades."

For Groupon, there's been a flood of publicity. In an average week the company adds about 500,000 subscribers. In the week after the Gap promotion, it added 750,000 subscribers. And then there's the potential for more offers from national retailers and manufacturers -- offers that, if the Gap promo is any indication, will generate a tidy profit for Groupon. Today, for example, Groupon teamed up with Fandango to offer Fandango customers a $4 movie ticket, if they signed up for Groupon.

The company is growing at a dizzying pace. In the last five months, it's expanded from one country to 29 countries, from 3 million subscribers to more than 15 million and from less than 300 employees to more than 1,500 employees. The addition of national brands could boost growth further.

The Gap Groupon, which let users buy a $50 credit for $25 and was timed to the back-to-school season, sold 441,000 units for more than $11 million. Mr. Solomon and a spokeswoman for Gap declined to share specifics of how the deal was structured. However, Mr. Solomon did say that typically Groupon shares equally in the profit with its partners. Regardless, it's clear the Gap promotion was a boon to both companies.

Gap has nearly half a million customers who now have a reason to go into a Gap store -- the coupon isn't valid online -- and the expectation is that those customers will spend more than just $50, likely upward of $75 to $100, Mr. Solomon said. That's $33 million to $44 million in sales if all of the Groupons are redeemed. Not all of them will be, of course. But Mr. Solomon maintains that redemption rates are "north of 80%" for the average Groupon.

"It's a significant chunk of sales. I'm pretty sure if they ran a national TV campaign, they wouldn't have gotten nearly 500,000 paying buyers in the store," said Mr. Solomon. "It's all about getting people in the store. When Gap gets people into the store, they're a fantastic brand, and they merchandise well. I guarantee 80% to 90% of people are buying more [than just $50 worth of product]."

Gap also got points from analysts for experimenting with Groupon. "These one-day-only deals generally focus on local products and services, so Gap's involvement is a testament to the fact that they are thinking outside of the box," wrote retail analyst Jennifer Black in a research note.

For now, Mr. Solomon said the company expects to end the year with between 20 million and 25 million subscribers. And it is on track to generate $400 million in gross sales. That begs the question: Is Groupon thinking about going public? Mr. Solomon said no.

"Currently we are focused on growing the company and defining the category, no IPO plans," he said.

Copyright © 1992-2012   Crain Communications   |   Privacy Statement   |   Contact Us

Exhibit A, Page 1

EXHIBIT B



1 of 1 DOCUMENT

Copyright 2011 Factiva ®, from Dow Jones
All Rights Reserved



(c) CNET Networks Inc. All Rights Reserved.

CNET News.com

January 24, 2011

**LENGTH:** 638 words

**HEADLINE:** Study: Americans sitting on $30 billion in unused gift cards

**BYLINE:** Daniel Terdiman

**BODY:**

If you're a vegetarian, and someone gives you a gift card for Ruth's Chris Steak House, you might find it difficult to use. The same might be true if your dog just died and someone gifted you a $50 PetCo card.

Mismatches such as those and millions more like them have added up to $30 billion worth of unredeemed gift cards that Americans are sitting on collectively, according to a leading player in the burgeoning secondary market for the ubiquitous cards.

In a just-completed study, Plastic Jungle, which buys and sells gift cards, reported that all-told, the U.S. market for them is about $90 billion annually. And of that, about 5 percent to 7 percent go unredeemed and unclaimed each year, said Bruce Bower, the CEO of Plastic Jungle.

Percentage-wise, that may not sound like much, but Bower said that on average, American households have about $300 worth of unredeemed cards. And that has led to the market that has pulled companies like Plastic Jungle, Cardpool, GiftCardRescue, and others into the fray, each hoping to scrape off profits by acting as exchanges between those who want cash for their unused cards and those who are interested in picking up cards at a discount. Some of these seem to be flourishing, with sales in the eight figures. And others, such as Leverage, have found it impossible to make a go of it.

You would think that retailers would be all too happy to see consumers let the cards waste away on cork boards and

Study: Americans sitting on $30 billion in unused gift cards CNET News.com January 24, 2011

fridges nationwide. But Bower said that increasingly, states are claiming the unused balances under escheatment laws--those that allow states to collect monies in abandoned bank accounts. At the same time, retailers know that consumers are likely to spend more than the value of their gift cards if they actually go shopping with them and often will buy higher-end goods than those without the cards, Bower said.

To be sure, gift card exchanges are nothing new--they have been around for some time, with many outfits paying as much as 92 cents on the dollar for unused cards and selling them at 3 percent to 5 percent--or higher--discounts. Popular national retailers like Home Depot, Best Buy, Target, and others can fetch the full 92 cents, while local and regional retailers may only get around 80 cents.

But with its study, Plastic Jungle has put dollar figures on the market and identified eye-popping value for the amount of money being spent on gifts that are never converted into anything tangible.

All of which could easily lead one to the conclusion that many people would be better off simply giving gifts of cash rather than gift cards for retailers that may or may not be used. But of course, while giving cash as gifts is standard in some cultures, in others it is seen as the height of impersonal. To Bower, gift cards, which themselves might seem to some to reek of the buyer having put little or no time into the present, actually represent the opposite. He says they show that someone is at least trying to think of the type of establishment a gift recipient might shop at and giving them a choice of what they want to buy there.

Still, with so many billions of dollars at stake, it seems obvious that retailers--who are teaming up with outfits like Plastic Jungle--may look for ways to streamline the process. That could mean gift cards that are good at multiple retailers, or which can buy a consolidated experience, such as dinner and a movie, Bower said, or an entire Valentine's Day suite, such as dinner, a spa treatment, flowers, and a night at a romantic hotel.

Either way, it's obvious that millions of Americans are going to keep on buying and giving gift cards, and Bower said that the total value of unredeemed cards is only likely to grow. But a tip for those who give the cards? Make sure the recipient's dog is still around before handing over that PetCo card.

**NOTES:**
PUBLISHER: CNET Networks Inc.

**LOAD-DATE:** January 27, 2011