SHIRLI FABBRI WEISS (079225)
CHRISTOPHER M. YOUNG (163319)
KATHERINE LARSON (259556)
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone: 619/699-2700
619/699-2701 (fax)
shirli.weiss@dlapiper.com
christopher.young@dlapiper.com
katherine.larson@dlapiper.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GROUPON MARKETING AND SALES PRACTICES LITIGATION | Case No.  3:11-md-02238-DMS-RBB<br><br>**DECLARATION OF SHIRLI FABBRI WEISS IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: September 7, 2012<br>Time: 1:30 p.m.<br>Judge: Hon. Dana M. Sabraw<br>Courtroom: 10 |

I, Shirli Fabbri Weiss, declare:

1. I am an attorney licensed to practice law in California and admitted to practice before this Honorable Court, and am a partner in the law firm of DLA Piper LLP (US), attorneys of record for Defendants in the above-captioned action. I have personal knowledge of the matters set forth in this Declaration, or, to the extent the statements describe Groupon's business, the matters are based on publicly-disclosed statements of Groupon.

2. Formed in November 2008, Groupon is an e-commerce marketplace that connects consumers to merchants by offering promotional collective buying deals on a wide variety of products and services.

3. Each day, Groupon provides consumers with a selection of "Daily Deal" promotional offers from merchants across the United States.

4. Consumers purchase Groupon Vouchers directly at Groupon's website, and the Groupon Vouchers can then be redeemed for the specified goods or services valued in excess of the purchase price of the Voucher at the identified offering merchant for a stated period of time.

5. A typical Daily Deal might allow a consumer to pay $20 to purchase a Groupon Voucher, which the consumer could then redeem for $40 worth of goods or services at the merchant specified on the voucher and as specified in the terms of the offer.

6. Consumers may sign up online to receive daily e-mails from Groupon regarding the promotional offers available each day in targeted geographic location(s) and categories selected by the consumer based on personal preference.

7. Consumers may also access Groupon's promotional offers directly through Groupon's website and mobile applications.

8. In order to purchase any Groupon Voucher or subscribe to receive daily e-mails regarding Groupon's "Daily Deals," a consumer must create a Groupon account by providing a valid e-mail address and agreeing to Groupon's Terms of Use.

9. Groupon has sold tens of millions of Groupon Vouchers throughout the U.S. since its inception in November 2008. As evidenced by Groupon's success in the market, there is great demand for Groupon Vouchers.

10.     These multi-district proceedings ("MDL"), styled *In Re Groupon Marketing and Sales Practices Litigation,* include seventeen cases, fifteen of which are putative class actions. A related putative class action is also pending in Illinois state court.

11.     Defendants deny Plaintiffs' allegations in these Actions and dispute that they are liable under any of the legal theories asserted by Plaintiffs or under any legal theory.

12.     Defendants contend that: (1) the Groupon Vouchers are encompassed within an exception for promotional gift certificates in the EFTA; (2) expiration of the Promotional Value of Groupon Vouchers is permitted under state law; and (3) expiration of the Customer Purchase Price value, as disclosed to consumers in Groupon's Terms and Conditions, expires in accordance with applicable state laws of the jurisdiction in which the Groupon was sold.

13.     Defendants further contend that all restrictions applicable to the Groupon Vouchers were adequately disclosed to consumers in Groupon's Terms and Conditions, its promotional offers relating to the Groupon Voucher, and/or on the face of the Groupon Voucher, and that such terms were not misleading or deceptive. State laws vary widely as to the definition and treatment of gift cards and it is not practicable for Groupon to try to describe every state's laws on its Vouchers, nor do its myriad competitors attempt to do so. Defendants believe it is sufficient that Groupon's Terms of Use directed consumers to consult their own state laws on expiration.

14.     In addition, Defendants have always contended that all of Plaintiffs' and the classes' claims are subject to mandatory arbitration and that Plaintiffs have waived the right to bring a class action under Groupon's Terms of Use that apply to consumers' Groupon accounts. *See CompuCredit Corp. v. Greenwood*, __ U.S. __, 132 S. Ct. 665, 668-69 (2012) (citing *AT&T Mobility LLC v. Concepcion,* __ U.S. __, 131 S. Ct. 1740 (2011) (upholding waiver of right to bring class action in arbitration agreement).

15.     As ordered by the Court, the parties have engaged in extensive formal discovery relating to Defendants' contention that the class claims are subject to mandatory arbitration, exchanging and responding to written discovery and document requests.

/////

16. Defendants further believe that Plaintiffs lack standing to pursue their claims under various state statutes because they have not suffered injury.

17. In addition, because Plaintiffs challenge millions of different Groupon deals, each of which involved different Merchant Partners, different Customer Purchase Prices and Promotional Values, different expiration dates, and different deal-specific terms, Defendants contend that if these Actions were to be litigated, there is no assurance that individual issues would predominate over common questions such that Plaintiffs would be unable to obtain and maintain class action status.

18. The proposed Settlement Agreement is the product of extensive arm's-length negotiations between counsel in which I personally participated and which spanned nearly a year, including a months-long mediation process overseen by an experienced and eminent retired judge, the Hon. Daniel Weinstein (Ret.).

19. Prior to reaching settlement, the Parties engaged in formal and informal discovery regarding arbitration, and extensively researched law and legislative history pertinent to the claims, permitting them to assess the relative strengths and weaknesses of their respective positions, and to compare the benefits of any proposed settlement to further litigation.

20. Following multiple telephonic meetings discussing settlement wheein it became apparent that the parties disagreed on virtually every material issue, the parties agreed to submit their dispute to professional mediation. Thereafter, the parties submitted settlement briefs and made other oral and written presentations to Judge Weinstein and attended an all-day in person mediation session on May 17, 2011, during which the parties narrowed the issues but were unable to reach a resolution.

21. Accordingly, the parties continued to negotiate the possibility and later the terms of settlement by way of innumerable telephonic conferences and other exchanges between the parties and with Judge Weinstein, which efforts ultimately led to an agreement in principle in August 2011, with the exception of Plaintiffs' attorneys fees and expenses, which the parties refrained from negotiating until all other terms of Settlement were set.

/////

22. After reaching agreement on the terms, the parties subsequently drafted and negotiated the Settlement Agreement, exchanging over a dozen versions of the Stipulation and the settlement exhibits, including the class notice, claim form, notice and claims administration program, and settlement vouchers.

23. Throughout the negotiations process, the parties frequently consulted Judge Weinstein on various issues, including the monetary and injunctive relief, the claims administration process, and the form of notice.

24. During the Fall of 2011, the parties reached impasse in their negotiations. The settlement was close to deteriorating at several critical junctures, but with Judge Weinstein's intervention and able guidance and assistance, the parties persevered and were ultimately able to resolve all the material issues in the draft Stipulation and 11 exhibits thereto filed with the Court.

25. Counsel for Defendants and Plaintiffs, both of whom have substantial experience in litigating class actions, zealously negotiated on behalf of their clients' best interests, and a settlement was reached only after multiple settlement proposals had been exchanged and rejected.

26. Throughout the parties' settlement discussions, including the initial mediation session on May 17, 2011, and the parties' negotiations thereafter, the parties always negotiated at arms-length.

27. While Defendants deny Plaintiffs allegations and contend that they have valid defenses in fact and law, Defendant recognize that further litigation would be expensive, complex, and time consuming and likely involve appeals by one side or the other.

28. If litigation were to proceed, Defendants anticipate the need for complex litigation on a number of issues, including whether the claims can be litigated at all or are subject to arbitration on an individual basis.

29. Assuming that the Court were to determine that Plaintiffs' claims are not subject to arbitration, extensive discovery on class certification and the merits of Plaintiffs' claims and Groupon's defenses would be required.

30. In light of the above, I believe that the Settlement Agreement is fair, reasonable, and adequate.

31.     In addition to the individual e-mail notice provided to Class Members directing to them to the Settlement Website and the posting of notice and information regarding the Settlement on the Settlement Website, the Settlement has also been well-publicized by the media over the past few months, and a number of media sources, including major newspapers and broadcasters such as the Los Angeles Times and ABC News, have publicized the Settlement and provided the Settlement Website URL for Class Members to obtain additional information.

32.     A relatively small number of objections have been filed, a number were filed by professional objectors who routinely appear in class actions in the hopes of derailing a settlement in the District Court or in the Court of Appeals for their own pecuniary gain.

33.     The *cy pres* recipients designated in the Settlement Agreement were neither proposed nor selected by DLA Piper LLP.  Attached hereto as Exhibit 1 are true and correct copies of screenshots of the *cy pres* recipients' websites.

34.     The Notice Program set forth in the Settlement Agreement and carried out by Rust Consulting ("Rust") informed Settlement Class Members of the Settlement terms, provided contact information for Rust as the Claims Administration in the event they had questions, and explained that when the Court considers final approval at the Fairness Hearing, Settlement Class Members who object to the Settlement may be heard.

35.     Groupon has informed all Merchant Partners of the Settlement and begun to educate them on the terms of the Settlement, including their obligations to honor Settlement Vouchers presented within 130 days of the issue date.

36.     After signing the Settlement Agreement, the Parties agreed, subject to Court approval, to a minor modification of §E.2 of the Agreement, which addresses notice to merchants. That section provided: "Within seven (7) days of the Effective Date, Groupon will notify all past and current Merchant Partners through means and content reflected in Exhibit 10 that they may be presented with Settlement Vouchers and requesting that they redeem all Settlement Vouchers presented by Settlement Class Members presented within 130 days of the Settlement Voucher's Issue Date." The Parties agreed, subject to Court approval, to replace that language with the following language: "Groupon will notify all past and current Merchant Partners of the

Settlement. As the Settlement Vouchers are issued by the Claims Administrator in response to Class Member Claims, Groupon will send notice through means and content reflected in Exhibit 10 to potentially impacted Merchant Partners and request that they redeem all Settlement Vouchers presented by Settlement Class Members within 130 days of the Settlement Voucher's Issue Date."

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of August, 2012, in San Diego, California.

s/ Shirli Fabbri Weiss
SHIRLI FABBRI WEISS

# TABLE OF CONTENTS

# EXHIBITS TO DECLARATION OF SHIRLI FABBRI WEISS

| **EXHIBIT TAB** | **PAGE NOS.** |
|---|---|
| EXHIBIT A | 1-8 |

# EXHIBIT 1



**HOME** | **ABOUT** | **OUR WORK** | **DEEPLINKS BLOG** | **PRESS ROOM** | **TAKE ACTION** | **SHOP**



## UPDATES

**Content Industry War on Sharing Claims Another Victim**
DEEPLINKS BLOG | August 9, 2012

**Thanks for Supporting EFF in Las Vegas and Beyond!**
DEEPLINKS BLOG | August 9, 2012

**EFF to Jordanian Ministry of Information: Keep the Internet Open**
DEEPLINKS BLOG | August 9, 2012

**Good News: Craigslist drops exclusive license to your posts**
DEEPLINKS BLOG | August 9, 2012

**Twitter Withholds Information from Police After Troll Threatens Murder? Not Quite**
DEEPLINKS BLOG | August 8, 2012

More Deeplinks Blog and Press Releases

### EFF in the News

**Executive Order On Cybersecurity Being Considered By Obama White House**
THE HUFFINGTON POST
AUGUST 8, 2012

**Drones tested as tools for police and firefighters**
THE LOS ANGELES TIMES
AUGUST 5, 2012

### Whitepapers

**From Fingerprints to DNA: Biometric Data Collection in U.S. Immigrant Communities and Beyond**

**Human Rights and Technology Sales: How Corporations Can Avoid Assisting Repressive Regimes**

### Upcoming Events

**Campus Party – Berlin 2012**
BERLIN, GERMANY
August 21, 2012 – 9:00am to August 26, 2012 – 5:00pm

**Mitigating DDoS Attacks: Best Practices for an Evolving Threat Landscape**
AMA EXECUTIVE CONFERENCE CENTERS
September 19, 2012 – 10:00am

 **Donate to EFF**

 **Join EFF**

### Stay in Touch

### Follow EFF

France plans to defund agency in charge of disconnecting users accused of copyright infringement. It's not enough.
https://eff.org/r.5ahE
AUG 10 @ 9:26AM

Innovative ebook lending start-up falls victim to the content industry's war on sharing
https://eff.org/r.a8hC
#copyright #lendink
AUG 9 @ 4:22PM

Twitter | Facebook | Identi.ca

### Projects

**HTTPS Everywhere**

**Bloggers' Rights**

**Coders' Rights**

**FOIA Project**

**Follow EFF**

**Free Speech Weak Links**

**Global Chokepoints**

**Patent Busting**

Exhibit 1, Page 1



| | | | |
|---|---|---|---|
| **Twitter confronts ethics of commercial pressures in wake of Guy Adams 'mess'**  THE GUARDIAN  AUGUST 3, 2012  More EFF in the News... | **Defending Privacy at the U.S. Border: A Guide for Travelers Carrying Digital Devices**  **Know Your Rights!** | **21st Annual Pionner Award Ceremony**  PROJECT ONE GALLERY  September 20, 2012 – 7:00am  More Events... | **Surveillance Self-Defense**  **Takedown Hall of Shame**  **Teaching Copyright**  **Ways To Help** |

EFF thanks DIGITAL REALTY TRUST & NephoScale

Thanks | RSS Feeds | Copyright Policy | Privacy Policy | Contact EFF

Exhibit 1, Page 2



HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP

- EFF's History
- Staff
- Board of Directors
- Advisory Board
- Fellows
- Interns
- Opportunities
  - Job Openings
  - Interns
  - Volunteer
- Contact EFF
  - Legal Assistance from EFF

# About EFF

From the Internet to the iPod, technologies are transforming our society and empowering us as speakers, citizens, creators, and consumers. When our freedoms in the networked world come under attack, the Electronic Frontier Foundation (EFF) is the first line of defense. EFF broke new ground when it was founded in 1990—well before the Internet was on most people's radar—and continues to confront cutting-edge issues defending free speech, privacy, innovation, and consumer rights today. From the beginning, EFF has championed the public interest in every critical battle affecting digital rights.

Blending the expertise of lawyers, policy analysts, activists, and technologists, EFF achieves significant victories on behalf of consumers and the general public. EFF fights for freedom primarily in the courts, bringing and defending lawsuits even when that means taking on the US government or large corporations. By mobilizing more than 140,000 concerned citizens through our Action Center, EFF beats back bad legislation. In addition to advising policymakers, EFF educates the press and public.

EFF is a donor-funded nonprofit and depends on your support to continue successfully defending your digital rights. Litigation is particularly expensive; because two-thirds of our budget comes from individual donors, every contribution is critical to helping EFF fight—and win—more cases.

Additional information:

- Information on donating to EFF
- Learn about significant EFF court victories
- Learn more about EFF's founding

Annual Reports

EFF's Annual Reports are publicly-available:

- 2009-2010 Annual Report
- 2008-2009 Annual Report
- 2007 Annual Report
- 2006 Annual Report



Donate to EFF

Join EFF

Stay in Touch

Follow EFF

France plans to defund agency in charge of disconnecting users accused of copyright infringement. It's not enough.
https://eff.org/r.5ahE
AUG 10 @ 9:26AM

Innovative ebook lending start-up falls victim to the content industry's war on sharing
https://eff.org/r.a8hC
#copyright #lendink
AUG 9 @ 4:22PM

Twitter   Facebook   Identi.ca

Projects

HTTPS Everywhere

Bloggers' Rights

Coders' Rights

FOIA Project

Follow EFF

Free Speech Weak Links

Global Chokepoints

Patent Busting

Exhibit 1, Page 3

- Surveillance Self-Defense
- Takedown Hall of Shame
- Teaching Copyright
- Ways To Help



Thanks | RSS Feeds | Copyright Policy | Privacy Policy | Contact EFF



 

# ISSUES

- Free Expression
- Consumer Privacy
- Health Privacy
- Security & Surveillance
- Digital Copyright
- Internet Openness & Standards
- International
- Open Government



**SENATE FAILS TO MOVE FORWARD ON CYBERSECURITY**

« PREV    NEXT »    PAUSE

**ITU Resource Page**

**Ask CDT — Experts Answer Your Questions**

**Fellows Focus — Posts from Top Academics**

## NEWS & EVENTS | RESEARCH & ANALYSIS

Follow the latest CDT news with Press Releases, Events, and where we've been featured around the Internet.

| Filter by: | - All Issues - | | **1** \| 2 \| 3 \| 4 \| next » |
|---|---|---|---|
| **Name** | | **Issues** | **Date** |
| CDT Weighs in on Copyright Enforcement Strategy<br>*Blog Post*: The Administration's Intellectual Property Enforcement Coordinator (IPEC) is expected to release... | | Digital Copyright | 8/9/2012 |
| FTC Gets Record Settlement from Google for Privacy Violation<br>*Press Release*: Washington - The Federal Trade Commission today announced it has reached a record $22.5 million... | | Consumer Privacy | 8/9/2012 |
| Does HIPAA apply to health insurance exchanges?<br>*In the News*: Adding to the list of uncertainty surrounding health insurance exchanges is how they intersect with... | | Health Privacy | 8/8/2012 |
| CDT Supports Brazil's "Bill of Rights" for Internet Users<br>*Blog Post*: A modified version of this post originally appeared on Global Voices Advocacy.Tomorrow, a special... | | Free Expression | 8/7/2012 |
| Obama campaign app maps Democrats near you<br>*In the News*: The campaign to reelect President Barack Obama has taken canvassing to the next technological level... | | Consumer Privacy | 8/7/2012 |

**1** \| 2 \| 3 \| 4 \| next »

## RECENT BLOG POSTS

### CDT Weighs in on Copyright Enforcement Strategy
by *David Sohn* | August 9, 2012
*Filed under Digital Copyright, More Issues in Digital Copyright*

The Administration's Intellectual Property Enforcement Coordinator (IPEC) is expected to release its new "Joint Strategic Plan" by the end of this year. Responding to the IPEC's request for comments from the public to assist with developing the new plan, CDT has submitted its recommendations. The plan faces a substantial challenge in the wake of the bruising battle and public uprising over PIPA and SOPA:  namely, the widespread public perception that the Federal Government's... Continued »

### CDT Supports Brazil's "Bill of Rights" for Internet Users
by *Ellery Roberts Biddle* | August 7, 2012
*Filed under Free Expression, International Free Expression*

A modified version of this post originally appeared on Global Voices Advocacy.Tomorrow, a special committee in Brazil's Congress will vote on the Marco Civil da Internet, a "bill of rights" for Internet users. If passed, the law would represent a paramount advance in country's digital policymaking agenda.The Marco Civil da Internet, or Civil Regulatory Framework for the Internet, establishes a clear set of rights and responsibilities for users, sets strong net neutrality principles, and shields... Continued »

### It Takes a Village to Defend a Network
by *Alissa Cooper* | August 1, 2012
*Filed under Security & Surveillance, More Issues in Security & Surveillance*

Defending networks from malicious hacking exploits depends in large part on the voluntary, cooperative efforts of network operators, device makers, and Internet users.Today the Broadband Internet Technical Advisory Group (BITAG) -- a group of technical experts dedicated to building consensus about broadband network management -- has released a series of targeted,

Exhibit 1, Page 5

balanced recommendations to help stifle an emerging type of network attack. That attack has been used in recent years by the hacker... Continued »

### Cybersecurity Amendments Would Modernize 25-Year-Old Privacy Law

by *Greg Nojeim*, *Jon Miller* | August 1, 2012
Filed under *Security & Surveillance*, *Cybersecurity*

[Editors Note: This is one in a of series of blog posts from CDT on the Cybersecurity Act, S. 3414, a bill co-sponsored by Senators Lieberman and Collins that is slated to be considered on the Senate floor soon.]Two amendments to the Senate cybersecurity bill now being debated would require government agents to get a warrant before reading a person's email or secretly tracking someone through their mobile phone.  The amendments, if adopted, would be a huge privacy gain and address a long-... Continued »

Copyright © 2012 by Center for Democracy & Technology.

DONATE | CONTACT | EVENTS | FEEDS | PRIVACY

The content throughout this website that originates with CDT can be freely copied and used as long as you make no substantive changes and clearly give us credit. Details.



ABOUT | MEDIA | CONNECT | BLOG | STAFF | DONATE

 

SEARCH

## ABOUT CDT



The Center for Democracy and Technology is a 501(c)(3) nonprofit public policy organization and the leading Internet freedom organization working at the critical edge of policy innovation.

When the Internet was in its infancy, CDT shaped the first legislative choices and court decisions that allowed this technology of freedom to flourish.

Today, we are committed to finding innovative, practical and balanced solutions to the tough policy challenges facing this rapidly evolving medium.

CDT's Mission and Principles

## CDT'S RECORD OF SUCCESS

CDT has advocated for groundbreaking legislation, won landmark court cases, built winning coalitions and promoted industry standards and practices:

- CDT brought together companies and advocates to successfully argue before the Supreme Court for a new theory for protecting free speech online, giving the Internet the highest First Amendment protection.
- CDT worked with Congress to pass a landmark law (Sec. 230) shielding ISPs and online service providers from liability for user-generated content and paving the way for today's rich social media.
- CDT led a successful campaign to ensure the availability of strong encryption—fostering privacy, network security and robust e-commerce.
- CDT created the groundbreaking Anti-Spyware Coalition, widely credited with curtailing malware and improving trust and security on the Web.
- CDT organized bloggers and political activists to convince regulators to free citizens' online political advocacy from ill-fitting campaign finance rules, revolutionizing politics and empowering individuals in their communities.
- CDT shaped a new generation of health privacy protections, supporting the development of innovative new technology essential to better healthcare.
- CDT partnered with human rights groups, companies, academics and investors to create the Global Network Initiative, which is helping companies chart an accountable path forward when faced with escalating demands from repressive regimes to assist with surveillance and censorship.
- CDT created the Digital Due Process coalition composed of Internet and telecommunications companies and advocates from across the political spectrum, now working to ensure that information stored in the Internet cloud has strong protections against government access.
- CDT created the Global Internet Policy Initiative (GIPI), which trains and provides legal and policy support to Internet freedom advocates working to promote policies and practices that support the open Internet.
- CDT is strengthening privacy protection through the development of industry best practices on the use of RFID, digital watermarking, digital signage, mobile applications and more.
- CDT was among the first to explain the serious flaws in Internet filtering legislation and worked closely with advocacy organizations, companies, and engineers to defeat PIPA and SOPA – anti-piracy bills that would have undermined cybersecurity, balkanized the Internet, and impaired legitimate online speech.

## ISSUES

- Free Expression
- Consumer Privacy
- Health Privacy
- Security & Surveillance
- Digital Copyright
- Internet Openness & Standards
- International
- Open Government



VIEW OUR BOARD OF DIRECTORS



VIEW OUR FULL STAFF



VIEW OUR ACADEMIC FELLOWS

## JOBS WITH US

Communications Associate

Director/Representative - CDT Brussels (Revised)

Policy Analyst

More >>

## EVENTS

« August »

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

REVIEW OUR FINANCIALS



VIEW OUR ANNUAL REPORTS

Copyright © 2012 by Center for Democracy & Technology.

The content throughout this website that originates with CDT can be freely copied and used as long as you make no substantive changes and clearly give us credit. Details.

DONATE | CONTACT | EVENTS | FEEDS | PRIVACY

Exhibit 1, Page 8