Subscribe   Follow
site search

HOME | ABOUT | FEATURED DISCUSSIONS | POL COLUMNS | CATEGORIES | ARTICLES | BOOKS | PODCASTS | EVENTS

# The problem of self-dealing by class counsel

Tweet 1

APRIL 17, 2012 12:18 PM

**Ted Frank**

As Judge Posner once said, "class actions are rife with potential conflicts of interest between class counsel and class members." This comes into play most often at the class action settlement stage.

Defendants want to minimize the amount they pay. Class counsel wants to maximize the amount they receive, but they're also negotiating on behalf of their clients in the same negotiation. It's all too easy for parties at the table, explicitly or tacitly, to freeze out the absent class members—especially when a professional mediator is pushing them to settlement without considering the interests of parties not at the bargaining table.

For this reason, Rule 23(e) and state analogues requires a fairness hearing where the court ensures that the settlement is fairly treating the class. But judges have their own perverse incentives: approving a settlement (often presented to the court *ex parte* without any well-crafted objections helpful to the court's consideration) is easy, and reduces a court's workload by taking a complicated case off the docket; scrutinizing or rejecting a settlement requires hard work, and adds to the court's workload.

Add to this the underconsidered fact that the system creates perverse incentives for for-profit objectors. A successful objection can derail a settlement, leaving an objector uncompensated; even an objection that improves the settlement at the margin for the class is no guarantee of recovery—I've seen judges put more effort into cutting down and criticizing five-digit fee requests from objectors that are a single-digit percentage of the marginal settlement improvement than seven-digit fee requests from class counsel that are higher than class recovery. But if a "professional objector" *loses* an objection—well, that's where they can make some real coin. Threatening or engaging in an appeal can cost class counsel a year or more's delay in receiving their fees; add to that a non-zero risk that an appellate court will give scrutiny to a deal that the district court didn't. Now an objector has leverage, and can receive substantial payments for their own self-dealing and dismissing an appeal—and those payments, nuisance or otherwise, are often far more than the professional objector could receive for winning an objection.

The result is a holy mess. Professional objectors respond to the perverse incentives by objecting in bulk with low-quality objections. Judges go years without seeing a useful objection, and start acting as intelligent Bayesians and rejecting objections wholesale. Class action attorneys on both sides of the "v." know that they don't have to worry about district-court scrutiny and that the appeals will likely disappear before being decided, and have little incentive to follow the requirements.

Little, but not none. If the parties show up with an all-cash settlement where the class counsel is collecting 90% of the proceeds, even the least conscientious judge is likely to smell a rat. But if the parties can show up with amorphously-defined non-pecuniary relief conducive to exaggerated value, they can self-servingly claim that a settlement is worth much more than it is, and thus rationalize a deal where class counsel gets the lion's share of the true economic value. (I'm in Los Angeles today to argue the *Bluetooth Headset* case, where class counsel is shamelessly claiming that trivial warnings in instruction pamphlets no one reads about the obvious dangers of loud noises are worth $874 million.) The smoke and mirrors, combined with the lack of an adversary proceeding, is either sufficient to snow a busy judge who doesn't have time to see through the tomfoolery or, if one is really cynical, gives judges the cover to move cases off of their docket. So a profit-maximizing class counsel is rarely going to agree to an all-cash settlement and, indeed, in the consumer context, we rarely see them.

It's this mess that inspired me to see if the systematic unfairness to class members caused by self-dealing class counsel could be fixed with well-crafted objections by non-profit counsel willing to irrationally see objections through appeal and forgo the lucrative tactic of selling their appeals for money. Immersing myself in this world has made me realize the self-dealing problem is wildly pervasive, and far worse than reported in the academic literature.

I should clarify: there are certainly those who object to attorneys fees in class actions cynically as a means of attacking the class action. I've said it before, and I'll say it again: the optimal number of class actions is greater than zero. It's likely smaller than the number of class actions we actually have, but my criticism of rubber-stamping settlements that overpay attorneys is not a backdoor attempt to abolish the class action. I'm not complaining about the case where an attorney wins a $4 refund for a million people, and collects $1 million for himself; that's the way the class action system is supposed to work, by aggregating materially identical claims that couldn't be brought efficiently individually.

What I'm seeing, however, are cases where the class gets entirely illusory relief, and the attorneys walk away with millions, 100% of the economic value. Or, even in the all-cash cases, class counsel finds a defendant that

FEATURED DISCUSSION A
Obamacare Decision: Rea 2012
Law School Faculty Diver 2012
Class Actions, May 2012
Constitutionality of Indiv Mandate, March 2012
Human Rights and Intern February-March 2012
The constitutionality of F Obama's recess appointm 2012
Do caps on medical malpr damages hurt consumers 2011
Trial Lawyers Inc.: State General, October 2011
Wal-Mart v. Dukes, April 2
Kagan Supreme Court no May-June 2010
Election roundtable, Nove 2006
Who's the boss, September
Medical judgement, July 2
Lawyer Licensing, May 20
Contingent claims, April 2
Smoking guns, July 2004

Contact us:
**Isaac Gorodetski**
Project Manager,
Center for Legal Policy at the Manhattan Institute
igorodetski@manhattan-insti

Media Inquires:
**Bridget Carroll**
Press Officer,
Manhattan Institute
bcarroll@manhattan-institute

will roll over immediately, and, with no risk, can collect several times counsel's lodestar by asserting a right to 25% to 35% of the common fund. For example, class counsel in the *Bank of America* overdraft litigation—where Professor Fitzpatrick testified in favor of a payment of over 30% what was available to the class—took two depositions, litigated for five months, and then settled for nine cents on the dollar, virtually a nuisance settlement merely for bringing the complaint. That's a zero-risk proposition that does not merit an extraordinary payday of a multiplier several times already-handsome lodestar rates. (Remember that "lodestar" can include as much as $400/hour for paralegals, who are assuredly not being paid $800,000/year by the partners who own the law firm.) The $123 million the attorneys are getting is at the expense of their clients, who are getting only $250 million. That's only possible because of a legal cartel: if that litigation had been put out to a market-based bid, the fees would be much closer to ten percent rather than a third.

Until recently, the favorite way to exaggerate settlement value was with coupons. The defendant would issue coupons to class members with enough restrictions that they'd rarely be used. The parties would tell the court, "Look, $100 million of coupons, and we're only asking for $20 million in fees!" And the defendant would be out of pocket approximately $21 million when 1% of the coupons were used—assuming that they hadn't raised their prices to compensate for the expected redemptions.

Coupons now have a bad enough name that no one dares to call their coupon settlement a coupon settlement these days: instead, they're "rebates," or "vouchers," or "e-credits." Judges usually see through this, but I have an appeal pending in the Ninth Circuit where the court bought the argument that the coupon relief wasn't a "coupon" because the parties agreed to call it a "gift card." And even when courts recognize the coupons as coupons, they're not always willing to follow the inconvenient requirements of the Class Action Fairness Act.

So what are settling parties doing instead to exaggerate settlement value? I'll discuss that Wednesday. But I fear that I haven't given Professor Fitzpatrick enough to disagree with here. So let me add some food for thought.

In November's Federalist Society panel, Professor Fitzpatrick justifies the outsized fees as "deterrence." But if attorneys' incentives are to bring "big" cases, rather than "high-merit" cases, that completely undermines any deterrence value. Bank of America gets sued because it's big, rather than because it did something wrong. And if Bank of America actually did something wrong, the attorneys willing to settle quick and cheap lets it get away with that—they've still made billions on something the attorneys claim was illegal. Why should the class attorneys make $123 million for enabling that? When attorneys can wildly profit from nuisance settlements against deep pockets because they don't have to ensure that their clients actually receive any proceeds, that hurts deterrence, because the good companies are getting taxed by the class action system almost as much as the bad actors are.

Categories: Class Actions

Published by the Manhattan Institute

