# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING


------------------------------
                                )
                                )
IN RE:  GROUPON, INC.,          )
MARKETING AND SALES PRACTICES   )      CASE NO.11MD2238-DMS
                                )         SAN DIEGO, CALIFORNIA
                                )      FRIDAY, SEPTEMBER 7, 2012
                                )          1:30 P.M CALENDAR
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING/FINAL APPROVAL HEARING


REPORTED BY:            LEE ANN PENCE,
                        OFFICIAL COURT REPORTER
                        UNITED STATES COURTHOUSE
                        940 FRONT STREET, ROOM 2160
                        SAN DIEGO, CALIFORNIA 92101

COUNSEL APPEARANCES:


  FOR PLAINTIFF:        JOHN J. STOIA, JR., ESQ.
                        RACHEL L. JENSEN, ESQ.
                        THOMAS R. MERRICK, ESQ.
                        ROBBINS GELLER RUDMAN & DOWD
                        655 WEST BROADWAY SUITE 1900
                        SAN DIEGO, CALIFORNIA 92101


  FOR DEFENDANT:        SHIRLI FABBRI WEISS, ESQ.
                        CHRISTOPHER YOUNG, ESQ.
                        DLA PIPER
                        401 B STREET, SUITE 1700
                        SAN DIEGO, CALIFORNIA 92101


  FOR OBJECTORS:        GRENVILLE PRIDHAM, ESQ.
                        2522 CHAMBERS ROAD, SUITE 100.
                        TUSTIN, CALIFORNIA 92780


                        THEODORE FRANK
                        1718 M STREET NW NO. 236.
                        WASHINGTON DC 20036

                        MARK BULGARELLI, ESQ.
                        505 N. LASALLE SUITE 350.
                        CHICAGO, ILLINOIS 60654.

                        PAUL R. HANSMEIER, ESQ.
                        ALPHA LAW FIRM.
                        80 S. 8TH STREET, SUITE 900.
                        MINNEAPOLIS, MINNESOTA 55402

```
 1   SAN DIEGO, CALIFORNIA - FRIDAY, SEPTEMBER 7, 2012 - 1:30 P.M.

 2                              *   *   *

 3           THE CLERK:    CALLING NO. 25 ON CALENDAR, CASE

 4   NO. 11MD2238, IN RE GROUPON, INC.; ON FOR MOTION HEARING AND

 5   FINAL APPROVAL HEARING.

 6           THE COURT:   GOOD AFTERNOON.

 7           MAY I HAVE APPEARANCES, PLEASE?

 8           MR. STOIA:   YES.  GOOD AFTERNOON, YOUR HONOR.  JOHN

 9   STOIA, AND WITH ME IS RACHEL JENSEN AND TOM MERRICK OF MY

10   OFFICE, CLASS COUNSEL FOR PLAINTIFFS.

11           THE COURT:   THANK YOU.

12           MS. WEISS:   GOOD AFTERNOON, YOUR HONOR.  SHIRLI

13   WEISS, DLA PIPER, AND CHRIS YOUNG, FOR GROUPON, NORDSTROM,

14   FULL CIRCLE FARMS, WHIRLY WEST, FUN TIME LLC AND THE GAP.

15           THE COURT:   THANK YOU.  GOOD AFTERNOON.

16           THERE ARE A NUMBER OF OBJECTORS PRESENT AS WELL,

17   COULD I HAVE --

18           MR. PRIDHAM:   GRENVILLE PRIDHAM FOR OBJECTORS SPIES

19   AND PRIDHAM.

20           THE COURT:   ALL RIGHT.  CAN I GET THE -- JUST WANT

21   TO MAKE SURE.  CAN I GET THE NAME AGAIN?

22           MR. PRIDHAM:   GRENVILLE PRIDHAM.  G-R-E-N-V-I-L-L-E

23   LAST NAME P-R-I-D-H-A-M.

24           THE COURT:   OKAY.  THANK YOU.

25           MR. FRANK:   THEODORE FRANK FOR HIMSELF.
```

```
 1              THE COURT:  THANK YOU.

 2              MR. BULGARELLI:  MARK BULGARELLI ON BEHALF OF

 3    OBJECTOR AND PLAINTIFF NICHOLAS SPENCER.

 4              THE COURT:  AND THERE IS ONE OTHER PERSON ON THE

 5    PHONE.

 6              CAN YOU HEAR US?

 7              MR. HANSMEIER:  YES, I CAN, YOUR HONOR.  PAUL

 8    HANSMEIER FOR OBJECTOR PADRAIGIN BROWNE.

 9              THE COURT:  ALL RIGHT.  THANK YOU.  GOOD AFTERNOON.

10              I HAVE READ EVERYTHING.  THERE ARE A NUMBER OF

11    OBJECTIONS.

12              I UNDERSTAND FULLY THE PARTIES' POSITIONS.  I HAVE

13    CONSIDERED CAREFULLY THE PARTIES' RESPONSE TO THE OBJECTIONS

14    AND THE FEE REQUEST.

15              I THINK WHAT MIGHT BE MOST PRODUCTIVE IS TO START

16    WITH THE OBJECTORS, AND THEN I CAN INVITE A RESPONSE FROM THE

17    PARTIES.

18              PERHAPS I CAN HEAR FIRST FROM MR. FRANK.  YOU HAVE

19    COME FAR.  I HAVE READ ALL OF YOUR BRIEFING, WHICH I

20    APPRECIATE.

21              MR. FRANK:  THANK YOU.

22              THE COURT:  YES.

23              MR. FRANK:  I THINK WHAT THIS COMES DOWN TO IS THE

24    BLUETOOTH COMMAND, THAT YOU LOOK AT WHAT THE CLASS ACTUALLY

25    RECEIVES.  AND WHAT IS THE CLASS ACTUALLY GOING TO RECEIVE
```

1    HERE.  WE HAVE HEARD THAT THERE ARE GOING TO BE 47,000 CLAIMS

2    AS OF AUGUST 18TH, AND REALISTICALLY PEOPLE ARE GOING TO MAKE

3    THE CLAIMS WHEN THEY FIRST GET THE E-MAILS, AND THEY ARE GOING

4    TO FRITTER OUT AFTERWARDS.  I THINK THE 150,000 NUMBER IS

5    IMPLAUSIBLE.

6          AND WHAT ARE THOSE 47,000 CLAIMANTS GOING TO

7    RECEIVE?  WELL, ALL OF THEM ARE GOING TO RECEIVE, FIRST OF

8    ALL, A GROUPON VOUCHER, A GROUPON SETTLEMENT VOUCHER THAT IS

9    GOOD FOR 130 DAYS.  AND IF, AND ONLY IF, THE SETTLEMENT

10   VOUCHER IS NOT ACCEPTED BY THE VENDOR, THEN THEY CAN MAKE A

11   SECOND CLAIM FOR CASH.  ASSUMING, FIRST OF ALL, THAT THEY GET

12   THE GROUPON SETTLEMENT VOUCHER SOME TIME SEVERAL MONTHS IN THE

13   FUTURE.

14          AND KEEP IN MIND THAT GROUPON SETTLEMENT VOUCHERS

15   ARE NOT NEW RELIEF, THAT IS SOMETHING THAT WAS AVAILABLE TO

16   THE CLASS ALL ALONG, AND NOBODY DISPUTES THAT.  IT HAS ALWAYS

17   BEEN THE CASE THAT ONE COULD USE THE EXPIRED GROUPON FOR THE

18   PURCHASE PRICE VALUE.

19          SO SOME SMALL PERCENTAGE OF THAT 47,000 IS GOING TO

20   BE ABLE TO MAKE A CLAIM FOR A 120 PERCENT OF THEIR PURCHASE

21   PRICE, OR 100 PERCENT AND 20 PERCENT OF THE GROUPON

22   PROMOTIONAL PRICE.

23          THE TOTAL VALUE OF THAT, THAT IS NOT EVEN GOING TO

24   REACH $100,000, WHAT WE ARE TALKING ABOUT, VERSUS THE $2

25   MILLION THAT CLASS COUNSEL IS ASKING FOR.  IT IS VERY LIKELY

1   THAT RUST CONSULTING IS GOING TO MAKE MORE MONEY OFF OF THIS

2   CASE THAN THE CLASS IS.  AND WE KNOW THAT THE RUST CONSULTING

3   NUMBERS ARE GOING TO BE PRETTY HIGH BECAUSE SOMEHOW THEY WERE

4   NOT MENTIONED IN THE PAPERS, EVEN THOUGH I INDICATED THIS IS A

5   PRETTY IMPORTANT NUMBER:  HOW MUCH IS THE NOTICE COST, HOW

6   MUCH IS THE SETTLEMENT ADMINISTRATIVE COST.

7        **THE COURT:**  THE 100,000 NUMBER YOU CAME UP WITH, IS

8   THAT BECAUSE OF THE NUMBER OF CLAIMANTS INITIALLY, IF THEY

9   RESPOND AND GET THE GROUPON VOUCHER THEY WILL SIMPLY GET THE

10  GOODS AND SERVICES THAT THEY WERE ENTITLED TO, THERE WON'T BE

11  ANY REFUND OR PAYMENT OUT OF THE SETTLEMENT FUND?

12       **MR. FRANK:**  THAT IS CORRECT.  THERE WILL BE NO

13  PAYMENT OUT OF THE SETTLEMENT FUND -- AND AGAIN --

14       **THE COURT:**  SO THE 100,000 COMES FROM THOSE

15  CLAIMANTS WHERE THE MERCHANT IS NO LONGER IN BUSINESS OR THE

16  MERCHANT DOESN'T HONOR THE VOUCHER.

17       **MR. FRANK:**  WE ARE ASSUMING, YOU KNOW, THERE IS

18  GOING TO BE LEAKAGE ALL ALONG.  SOME PERCENTAGE AREN'T GOING

19  TO GET THEIR VOUCHERS AT ALL, THEY WILL HAVE MOVED IN THE

20  INTERIM.  SOME PERCENTAGE ARE GOING TO GET THE VOUCHERS AND

21  NOT TRY TO USE THEM.  SOME PERCENTAGE ARE GOING TO GET THE

22  VOUCHERS AND USE THEM.  SOME PERCENTAGE ARE GOING TO GET THE

23  VOUCHERS, BE UNABLE TO USE THEM, AND NOT MAKE THE SECOND

24  CLAIM.

25       **THE COURT:**  WHAT ABOUT THE SECOND TIER, THEN.  SO IF

1    THERE IS MONEY IN THE SETTLEMENT FUND AND IT OPENS UP FOR

2    THOSE WHO PURCHASED AFTER DECEMBER 31, 2011.

3           **MR. FRANK:**  BUT THAT IS NOT A CLASS BENEFIT, THAT IS

4    A BENEFIT FOR PEOPLE WHO MAKES NEW PURCHASES.  AND ANYBODY WHO

5    MAKES A NEW PURCHASE, THEY ARE NOT -- IT IS A NEW CAUSE OF

6    ACTION IF GROUPON HAS DONE SOMETHING WRONG.

7           AND YOU CAN'T TAKE WHAT THE CLASS IS WAIVING AND

8    SAYING WE ARE GOING TO GIVE MONEY TO SOME FUTURE GROUP OF

9    PEOPLE, ASIDE FROM THE FACT THAT GROUPON REGULARLY GIVES

10   REFUNDS.  AND I HAVE RECEIVED THREE OF THEM, TWO OUTSIDE OF

11   THE CLASS PERIOD ONE INSIDE THE CLASS PERIOD.  SO WE DON'T

12   KNOW WHAT PERCENTAGE OF THOSE ARE GRATUITOUS RELIEF THAT IS

13   BEING CREDITED TO THE SETTLEMENT, WHEN IN FACT IT WAS RELIEF

14   THAT CLASS MEMBERS WOULD HAVE RECEIVED ANYWAY.

15          WE DON'T EVEN KNOW WHAT PERCENTAGE IS ACTUALLY GOING

16   TO GO TO THE CLASS.  AND THE IDEA THAT SOMEBODY IS GOING TO

17   REMEMBER TWO AND A HALF YEARS FROM NOW OH, YOU KNOW, I GOT AN

18   E-MAIL ABOUT A CLASS ACTION SETTLEMENT AND I SHOULD MAKE A

19   CLAIM SOMETIME IN 2014.

20          THAT IS JUST NOT GOING TO HAPPEN.  WE HAVE ALREADY

21   SEEN HOW FEW CLAIMS THERE ARE OVER TWO YEARS OF GROUPON USAGE,

22   AND THERE ARE GOING TO BE THAT MUCH FEWER FOR POST

23   DECEMBER 2011 CLAIMS.  SO WE ARE TALKING A VERY MINIMAL NUMBER

24   OF CLAIMS.

25          AND IF YOU -- YOU KNOW, IF YOU OFFER TO -- EVEN IF

1    YOU AFFIRM THE SETTLEMENT AS FAIR, BUT YOU SAID WE WILL FIGURE

2    OUT WHAT THE ATTORNEY'S FEES ARE BASED ON THE NUMBER OF CLAIMS

3    MADE IN THE FUTURE, YOU WILL FIND CLASS COUNSEL OBJECTING TO

4    THAT VOCIFEROUSLY, BECAUSE THEY KNOW THERE ARE NOT GOING TO BE

5    ANYWHERE NEAR $8.5 MILLION IN CLAIMS.  THE AMOUNT THAT IS

6    GOING TO BE PAID OUT IS GOING TO BE VANISHINGLY SMALL.

7         **THE COURT:**  WHAT ABOUT THE INJUNCTIVE RELIEF?

8         **MR. FRANK:**  AGAIN, THE INJUNCTIVE RELIEF IS RELIEF

9    THAT BENEFITS FUTURE PURCHASERS, DOESN'T COMPENSATE PEOPLE FOR

10   WHAT THEY HAVE DONE IN THE PAST.

11        IT HAS ALWAYS BEEN THE CASE THAT GROUPON HAS OFFERED

12   THE PURCHASE VALUE OF THE GROUPON.  AND THEY PUBLICIZE IT ON

13   THEIR WEBSITE.  THEY PUBLICIZED IT ON THEIR WEBSITE YEARS

14   BEFORE THE SETTLEMENT CAME INTO EFFECT.

15        IT HAS ALWAYS BEEN THE CASE THAT THEY HAD A

16   SATISFACTION GUARANTEE THAT MADE IT EASY FOR CLASS MEMBERS TO

17   GET SOME SATISFACTION.  AND CERTAINLY WE HAVE A COUPLE OF

18   DECLARATIONS OH, I DIDN'T GET -- I WASN'T -- I DIDN'T GET HELP

19   FROM CUSTOMER SERVICE.

20        AND, YOU KNOW, MAYBE THERE ARE GOING TO BE SOME

21   CLASS MEMBERS THAT ARE BETTER OFF; BUT THERE ARE GOING TO BE

22   SOME CLASS MEMBERS THAT ARE WORSE OFF.  THAT, IN ITSELF,

23   CREATES A 23(A)(4) PROBLEM.

24        THEY HAVE NOT TRIED TO QUANTIFY WHAT THE INJUNCTIVE

25   RELIEF IS WORTH, AND I THINK THERE IS A VERY GOOD REASON FOR

1    THAT.  THERE IS VERY LITTLE VALUE AT THE MARGIN FOR WHAT IS

2    BEING GIVEN UP HERE, WHICH IS PAST CLAIMS.

3           AN OPT-OUT GETS THE SAME INJUNCTIVE RELIEF AS

4    SOMEBODY WHO REMAINS IN THE CLASS.  SO IT IS NOT A CLASS

5    BENEFIT, IT IS JUST A GRATUITOUS BENEFIT TO THE WORLD.

6           **THE COURT:**  DOESN'T THE INJUNCTIVE RELIEF ALSO

7    PROVIDE FOR THINGS THAT SOMEONE OPTING OUT WOULDN'T GET?  FOR

8    EXAMPLE, THAT 130-DAY PERIOD TO REDEEM AN EXPIRED COUPON.

9           **MR. FRANK:**  NO, I MEAN, FIRST OF ALL, THAT HAS

10   ALWAYS BEEN AVAILABLE.  YOU DON'T NEED TO MAKE THE CLAIM TO GO

11   AND SAY -- TO THE VENDOR AND SAY HERE IS MY EXPIRED GROUPON,

12   PLEASE GIVE ME MY PURCHASE PRICE.

13          UNDER -- ACCORDING TO GROUPON, ACCORDING TO

14   GROUPON'S WEBSITE, IT HAS ALWAYS BEEN THE CASE THAT IF YOU

15   TAKE AN EXPIRED VOUCHER AND GO TO THE VENDOR YOU GET YOUR

16   PURCHASE PRICE WORTH.

17          SO IF YOU PURCHASE A $60 VOUCHER FOR $25 AND IT

18   EXPIRES, YOU CAN STILL GO TO THE VENDOR AND GET YOUR $25.  AND

19   THAT HAS ALWAYS BEEN THE CASE, ACCORDING TO GROUPON.

20          AND I MENTIONED THAT IN MY OBJECTION, AND NOBODY HAS

21   DISPUTED THAT.  THEY HAVE DISPUTED OTHER THINGS I HAVE SAID,

22   BUT THEY DIDN'T DISPUTE THAT.

23          **THE COURT:**  ALL RIGHT.

24          **MR. FRANK:**  AND IT IS NOT CLEAR WHAT ANYBODY IS

25   GETTING BY MAKING A CLAIM, IF ALL THEY ARE GETTING IS WHAT

```
 1   THEY ARE ORIGINALLY ENTITLED TO.

 2           NOW, AT THE END OF THE 130 DAYS, YOU KNOW, THEY CAN

 3   GO THROUGH A SECOND ITERATION AND MAKE A CLAIM.  BUT AGAIN,

 4   THAT IS GOING TO BE A TINY PERCENTAGE OF THE 47,000 PEOPLE WHO

 5   HAVE ALREADY MADE THAT CLAIM.  AND THAT TOTAL VALUE IS GOING

 6   TO BE IN THE FIVE DIGITS.  IT IS GOING TO BE REMARKABLY

 7   DISPROPORTIONATELY OUT-STRIPPED BY THE ATTORNEY'S FEES.

 8           THE COURT:  OKAY.  VERY GOOD.  THANK YOU --

 9           MR. FRANK:  THANK YOU, YOUR HONOR.

10           THE COURT:  -- FOR THE COMMENTS.

11           MR. BULGARELLI, DO YOU WISH TO BE HEARD?

12           MR. BULGARELLI:  GOOD AFTERNOON, YOUR HONOR.

13           THE COURT:  GOOD AFTERNOON.

14           MR. BULGARELLI:  THIS SETTLEMENT AGREEMENT CURRENTLY

15   BEFORE THE COURT IS SIMPLY UNFAIR AND SHOULD NOT BE APPROVED.

16   IT IS UNFAIR BECAUSE THERE IS NO VALUE.  AND, IN FACT, IT

17   GIVES NEGATIVE VALUE TO A CERTAIN SUBCLASS OF INDIVIDUALS IN

18   ILLINOIS.  THEY RIGHT NOW ARE ENTITLED TO GET MORE, AND CAN

19   GET MORE, AT THIS MOMENT, THAN WHAT THIS LITIGATION PROVIDES

20   FOR.

21           THIS OBJECTION REGARDING VALUE IS SEPARATE AND

22   DISTINCT FROM -- I KNOW THAT THERE WERE SEVERAL OTHER

23   OBJECTIONS REGARDING VALUE TO THE SETTLEMENT.  AND THIS IS A

24   SEPARATE AND DISTINCT ISSUE WHICH, FRANKLY, DEFENDANT NOR

25   CLASS COUNSEL HAS PROVIDED ANY SUBSTANTIVE RESPONSE TO IN
```

```
 1    THEIR RESPONSE TO OBJECTIONS, ONLY ADDRESSED IN A FOOTNOTE
 2    WITH SEVERAL THINGS THAT I CAN ADDRESS LATER THAT WERE
 3    COMPLETELY OFF-BASE.
 4         THE REASON THAT THIS PROVIDES NO VALUE IS THAT ON
 5    THE TERMS OF MR. SPENCER AND OTHERS SIMILARLY SITUATED,
 6    ILLINOIS CONSUMER GROUPS -- AND I STATE THAT THIS IS SEPARATE
 7    AND DISTINCT FROM WHAT THE PREVIOUS OBJECTOR, MR. FRANK, WAS
 8    TALKING ABOUT, TERMS ON THE WEBSITE.  DIRECTLY ON THEIR
 9    GROUPON IT STATES THAT SHOULD THIS GROUPON EXPIRE, NOT BE
10    REDEEMED, THEY CAN GO INTO THE RETAILER, THE MERCHANT
11    PARTNER -- GAP IN THE CASE OF MR. SPENCER -- AND EXCHANGE IT
12    FOR A GIFT CERTIFICATE EQUAL TO THE PURCHASE VALUE OF THE
13    GROUPON.
14         IN ILLINOIS, THE ILLINOIS CONSUMER FRAUD ACT, WHAT
15    COVERS GIFT CERTIFICATES AND GIFT CARDS, STATES THAT IT MUST
16    BE VALID FOR A FIVE-YEAR PERIOD.
17         THE COURT:  WHAT ABOUT THE ARGUMENT THAT PLAINTIFFS
18    MAKE THAT GROUPON IS NOT SUBJECT TO THIS LAW, THAT IT IS NOT A
19    GIFT CERTIFICATE WITHIN THE CARD ACT AND THE VARIOUS STATE
20    STATUTES?
21         MR. BULGARELLI:  WELL, YOUR HONOR, WHAT I AM
22    SPEAKING TO IS NOT THE CARD ACT.  IN THE RESPONSE THEY NEVER
23    EVEN ADDRESSED THE ILLINOIS LAW, THEY CITE TO THE FLORIDA LAW.
24    THE ILLINOIS LAW SPECIFICALLY SAYS SELLERS AND ISSUERS.  SO I
25    DON'T THINK THAT THERE IS ANY DOUBT THAT THIS APPLIES.
```

12

1          REGARDLESS, THOUGH, EVEN IF IT WAS TO APPLY, THIS

2     CASE IS RELEASING THE CLAIMS AGAINST THOUSANDS OF MERCHANT

3     PARTNERS, ONLY A FEW OF WHICH ARE NAMED HERE, THOUSANDS OF

4     WHICH ARE NOT EVEN NAMED, WHO SIMPLY -- IF FOR SOME REASON IT

5     DIDN'T APPLY TO GROUPON IT IS GOING TO APPLY TO THEM.  IN THE

6     CASE OF MR. SPENCER, THE SPENCER V. GAP CASE, IT IS GOING TO

7     BE APPLICABLE.

8          AS I WAS SAYING, DIRECTLY ON THERE IT SAYS THAT THEY

9     CAN REDEEM IT.  UNDER THE ILLINOIS ACT THEY GET FIVE YEARS.

10    SO RIGHT NOW THEY CAN WALK INTO GAP AND GET THE PURCHASE

11    VALUE, IN MR. SPENCER'S CASE IS $25, GOOD FOR FIVE YEARS.

12         THIS SETTLEMENT ONLY GIVES, AT BEST, THE PURCHASE

13    VALUE OF 25, WHAT COULD BE REDUCED BASED ON THE NUMBER OF

14    OPT-OUTS.  SO AT BEST SAME VALUE MAY BE LESS, AND ONLY GOOD

15    FOR 130 DAYS.  SO PLAINLY IT IS NOT FAIR IN THAT THERE IS NO

16    VALUE THAT THESE INDIVIDUALS HAVE RELIEF AND THEY ARE

17    RELEASING CLAIMS THAT THEY WOULD BE BETTER OFF WITHOUT.

18         THE APPROPRIATE STANDARD WHEN DEALING WITH WHETHER

19    SETTLEMENT IS FAIR IS TO LOOK AT WHAT WOULD HAPPEN IF THE CASE

20    WERE TO PROCEED, WHAT THE LIKELY OUTCOME WOULD BE.

21         SINCE WE ARE DEALING WITH TERMS DIRECTLY ON THE

22    GROUPONS, AND NOT ANYTHING ON THE WEBSITE OR ANYTHING, THE

23    ISSUE IS GOING TO BE SOMEWHERE BETWEEN THIS $25, FOR MR.

24    SPENCER AND OTHER PEOPLE, GOOD FOR FIVE YEARS, AND THE FULL

25    PURCHASE -- OR FULL REDEMPTION VALUE OF $50.  AND THE ILLINOIS

1    CONSUMER FRAUD ACT, WHAT GOVERNS HERE, ALSO ALLOWS FOR

2    PUNITIVE DAMAGES.  HERE WE HAVE NOWHERE WITHIN THAT SCALE.  WE

3    ARE, AT BEST, BELOW THAT SCALE JUST ON LENGTH OF TIME AND

4    MAYBE EVEN BELOW FURTHER ON DOLLARS.

5           THE SUBCLASS I AM REFERRING TO ISN'T JUST A FEW

6    INDIVIDUALS.  IN GAP'S OWN REMOVAL PAPERS, ORIGINALLY MOVED

7    THE SPENCER CASE FROM THE STATE COURT, THEY INDICATE THAT IN

8    ILLINOIS ALONE GAP, JUST ONE OF THESE MERCHANT PARTNERS, SOLD

9    100,000 GROUPONS WITH A VALUE OF $4 MILLION.  WAS, YOU KNOW,

10   HALF A SETTLEMENT FUND, AND WITH THE PUNITIVE DAMAGES THE

11   AMOUNT OF CONTROVERSY EXCEEDS $5 MILLION HERE.  SO WE HAVE A

12   SITUATION WHERE IT IS UNFAIR BECAUSE INDIVIDUALS ARE RELEASING

13   CLAIMS FOR NO VALUE.

14          AS I INDICATED, GROUPON AND CLASS COUNSEL PROVIDE NO

15   SUBSTANTIVE RESPONSE TO THIS OBJECTION.  FROM WHAT WE CAN

16   GLEAN FROM THEIR GENERALIZED OBJECTION TO OTHER CLAIMS --

17   OTHER OBJECTIONS -- EXCUSE ME -- THEY SEEM TO BE RESTING ON

18   THE FACT THAT THEY ALLEGE THERE IS AN ARBITRATION CLAUSE

19   BETWEEN -- WITH GROUPON.  WHETHER OR NOT THAT EXISTS OR NOT,

20   THAT IS STILL NOT A VALID ARGUMENT HERE AND DOES NOT PROVIDE

21   ANY VALUE.

22          THE REASON BEING IS, AS I SAID, WE HAVE THOUSANDS OF

23   MERCHANT PARTNERS WHO ARE BEING RELEASED.  BETWEEN THESE AND

24   THE SUBCLASS OF ILLINOIS CONSUMERS THERE IS ABSOLUTELY NO

25   ARBITRATION AGREEMENT BETWEEN THOSE PARTIES.

SEPTEMBER 14, 2012

14

```
 1              SO WHAT WOULD HAPPEN AT TRIAL?  MR. SPENCER AND THE
 2    SUBCLASS THAT HE SOUGHT TO REPRESENT THROUGH HIS CASE CAN
 3    PROCEED AGAINST GAP, AND THERE IS SIMPLY NO ARBITRATION CLAUSE
 4    IN THE WAY.  AND SO WHAT WOULD THE LIKELY OUTCOME BE?  STILL
 5    THAT 25, GOOD FOR FIVE YEARS, TO 50 AND PUNITIVES DOES NOT
 6    CHANGE THAT CALCULUS IN THE LEAST BIT.
 7              THE COURT:  THE ARBITRATION AGREEMENT ON THE
 8    GROUPON, YOU ARGUE, APPLIES ONLY BETWEEN MR. SPENCER AND
 9    GROUPON, NOT GAP?
10              MR. BULGARELLI:  YOUR HONOR, THE TERMS OF THE
11    CURRENT -- I KNOW THERE HAS BEEN MANY ITERATIONS OF IT --
12    SPECIFICALLY SAYS AT ITS BEGINNING THAT THIS COVERS ANY
13    DISPUTE BETWEEN YOU AND GROUPON.  THERE IS SIMPLY NO LANGUAGE
14    THAT SAYS IT APPLIES TO ANY OF THE MERCHANT PARTNERS.  AND WE
15    HAVE SEEN NOTHING TO BE OTHERWISE, YOUR HONOR.
16              AS I SAID, THEY ONLY ADDRESS THIS OBJECTION -- I
17    THINK FOR GOOD REASON -- IN TWO FOOTNOTES.  AND IF I CAN
18    RESPOND TO WHAT DEFENDANT AND CLASS COUNSEL SAY IN REGARDS TO
19    THAT.
20              ONE OF THEIR ARGUMENTS IS THAT THIS OBJECTION IS NOT
21    APPROPRIATE BECAUSE IT SHOULD HAVE BEEN RAISED BEFORE THE MDL
22    PANEL PRIOR TO THIS CASE GETTING TRANSFERRED.
23              THAT IS JUST PLAINLY NOT TRUE.  THERE IS -- THE
24    STANDARD CASE LAW HERE SAYS THAT TRANSFER IS APPROPRIATE IF
25    THE CLASSES ARE THE SAME OR IF A SUB CLASS OF ONE IS A CLASS
```

1   OF ANOTHER, AND IF THE SETTLEMENT WOULD BE TO RELEASE THE

2   CLAIMS OF THE OTHER ONE.  SO ARGUING AT THAT POINT WASN'T

3   APPROPRIATE.

4           AND MORE SO, EVEN IF WE HAD ARGUED AND THAT CASE WAS

5   STILL PENDING IN ILLINOIS WE WOULD STILL BE BEFORE YOUR HONOR

6   TODAY AS THE SETTLEMENT WOULD SEEK TO RELEASE THOSE CLAIMS AND

7   WE WOULD STILL HAVE THIS OBJECTION.

8           THEY ALSO TRIED TO MISPHRASE AND SAY THAT THIS IS A

9   MASS REQUEST FOR EXCLUSION.  IF WE WANTED TO EXCLUDE

10  MR. SPENCER WE WOULD HAVE FILED A REQUEST FOR EXCLUSION.  WE

11  BELIEVE THAT THIS SETTLEMENT IS UNFAIR BECAUSE OF THE SUBCLASS

12  HERE AS AN OBJECTOR.

13          WE DO SAY WITHIN THAT THAT WE BELIEVE PROBABLY THE

14  MOST APPROPRIATE IS TO DO A CARVE OUT AND SEVER THAT CASE.

15  BUT THAT IS AT YOUR HONOR'S DISCRETION.  REGARDLESS, THIS

16  SETTLEMENT GREATLY INFRINGES ON THE RIGHTS OF THE SUBCLASS,

17  AND THAT NEEDS TO BE DEALT WITH VIA THIS OBJECTION.

18          FINALLY, THEY ALSO TRY TO CLAIM THAT MR. SPENCER AND

19  A BUNCH OF OTHER OF THE OBJECTORS DON'T HAVE STANDING TO BE

20  HERE BECAUSE THEY HAVE NOT SHOWN THAT THEY ARE AN AGGRIEVED

21  CLASS MEMBER.

22          OUR OBJECTION ATTACHES MR. SPENCER'S GROUPON, IT

23  ATTACHES HIS COMPLAINT.  WE HAD TO FILE THE COMPLAINT WHICH

24  SPECIFICALLY ALLEGES HE TRIED TO REDEEM IT FOR THE FULL FACE

25  VALUE WHAT GAP WOULD NOT TAKE.

1       I SIMPLY DON'T KNOW WHAT ELSE WE COULD DO, EXCEPT

2  FOR IF THEY WANT EVERY ONE OF THE STORE CLERKS HERE AS

3  WITNESSES.  AND THERE IS SIMPLY NOTHING WITHIN THE SETTLEMENT

4  AGREEMENT THAT MUST -- THAT YOU MUST SHOW THAT YOU HAD THE

5  GROUPON.  NOT THAT, YOU KNOW, SOME EVIDENCE IT WAS DENIED,

6  WHAT WOULD BE SIMPLY IMPOSSIBLE, YOUR HONOR, TO BRING FORTH

7  BEFORE THE COURT.

8       **THE COURT:**  ALL RIGHT.  THANK YOU.  I APPRECIATE

9  THOSE CONCERNS.

10      **MR. BULGARELLI:**  THANK YOU.

11      **THE COURT:**  WHO WOULD LIKE TO SPEAK NEXT?

12      COUNSEL?

13      **MR. PRIDHAM:**  YES, THANK YOU, YOUR HONOR.  GRENVILLE

14  PRIDHAM APPEARING FOR EVAN SPIES AND ANDREA PRIDHAM.

15      THE GIST OF OUR OBJECTION IS THAT THE CY PRES TERMS

16  ARE NOT FAIR, AND THEY ARE NOT APPROVABLE UNDER CURRENT NINTH

17  CIRCUIT LAW AND OTHER CIRCUIT LAW.

18      THE ELECTRONIC -- THEY HAVE GOT A RESERVATION OF

19  $75,000 AUTOMATICALLY TO THE ELECTRONIC FRONTIER FOUNDATION,

20  AND THAT IS BEFORE ANY CLASS MEMBER RECEIVES ANY MONEY.  SO

21  THAT IS A PROBLEM.

22      THE SECOND PROBLEM IS THAT THE ELECTRONIC FRONTIER

23  FOUNDATION HAS NOTHING TO DO WITH THE SUBSTANTIVE ISSUES

24  INVOLVED IN THIS LAWSUIT.  THIS LAWSUIT IS ABOUT THE CARD ACT,

25  AND ANY ARGUMENT TO THE CONTRARY IS JUST FALSE AND MISLEADING,

1   DISINGENUOUS.  BECAUSE IF IT WEREN'T FOR THE CARD ACT THIS

2   LAWSUIT NEVER WOULD HAVE BEEN FILED.  AND IF IT WEREN'T FOR

3   THE STATUTORY DAMAGE PROVISIONS UNDER THE CARD ACT THE

4   DEFENDANTS MOST LIKELY WOULD NEVER BE TRYING TO SETTLE THIS

5   CASE, BECAUSE IT IS THE PROSPECT OF THESE LOOMING STATUTORY

6   DAMAGES, WHICH ARE BILLIONS OF DOLLARS, THAT COMPEL THE

7   DEFENDANTS TO ENTER INTO A SETTLEMENT HERE.

8        IF THESE ARBITRATION PROVISIONS REALLY WERE

9   ENFORCEABLE THEY WOULDN'T BE DOING A SETTLEMENT, THEY WOULD BE

10  ENFORCING AN ARBITRATION.  AND MY POSITION IS THAT THEY HAVE

11  WAIVED THEIR RIGHT TO ARBITRATION AT THIS POINT BY LITIGATING

12  THIS SO FAR.

13       THE REAL ISSUE HERE IS:  DOES THE CARD ACT APPLY,

14  AND ARE THOSE ISSUES BEING PROTECTED BY THE RECIPIENT OF THE

15  CY PRES AWARD.  AND THE ANSWER IS NO.

16       THIS IS NOT AN INTERNET PRIVACY ISSUE CASE, WHICH

17  THE ELECTRONIC FRONTIER FOUNDATION IS FAMOUS FOR.  AND I AM

18  NOT SAYING ANYTHING DISPARAGING ABOUT THEM.  THEY DO GREAT

19  WORK IN THE INTERNET PRIVACY ISSUES.  AND THIS IS NOT THAT

20  SORT OF A CASE.

21       THIS IS A CASE ABOUT THE CARD ACT, ABOUT CONSUMER

22  DECEPTIVE TRADE PRACTICES.  AND THERE ARE MORE APPROPRIATE CY

23  PRES RECIPIENTS THAN THE EFF.  THE NATIONAL CENTER -- CONSUMER

24  LAW CENTER IN BOSTON, MASSACHUSETTS.  THEY ADVOCATED HEAVILY

25  FOR THE CARD ACT.  THE NATIONAL ASSOCIATION OF CONSUMER

1    ADVOCATES, OF WHICH I AM A MEMBER, THEY ADVOCATED FOR THE CARD

2    ACT.  AND THEY EVEN SENT REPRESENTATIVES TO TESTIFY ON BEHALF

3    BEFORE CONGRESS.  AND THOSE ORGANIZATIONS ARE CLEARLY MORE IN

4    TUNE WITH THE ADVOCACY AND THE CONSUMER PROTECTION ISSUES

5    WHICH ARE PRESENTED IN THIS PARTICULAR CASE; NOT THE EFF.

6          **THE COURT:**  WHAT ABOUT THE OTHER ORGANIZATION THAT

7    WOULD BE A BENEFICIARY?

8          **MR. PRIDHAM:**  I THINK THAT IS AN OFFSHOOT -- MY

9    UNDERSTANDING IS IT IS AN OFFSHOOT OF THE EFF AND IT INVOLVES

10   PRIVACY, FOURTH AMENDMENT ISSUES AS WELL.  TO MY KNOWLEDGE, IT

11   IS NOT A CONSUMER DECEPTIVE TRADE PRACTICES ADVOCATE

12   ORGANIZATION; WHEREAS, THE NCLC -- THE NATIONAL CONSUMER LAW

13   CENTER -- AND THE NATIONAL ASSOCIATION OF CONSUMER ADVOCATES

14   ARE CONSUMER PROTECTION, DECEPTIVE TRADE PRACTICE ADVOCACY

15   GROUPS.  AND FOR THAT REASON I BELIEVE THAT THE SETTLEMENT

16   AGREEMENT MAY NOT BE APPROVED.

17          AND THEN THERE IS THE ISSUE OF SELF-DEALING IN THE

18   RELATIONSHIP BETWEEN COUNSEL AND THE EFF.  MY UNDERSTANDING IS

19   THEY HAVE REPRESENTED AND THEY HAVE A CLOSE -- DLA PIPER HAS A

20   CLOSE RELATIONSHIP WITH EFF.  AND THERE IS A -- SOME SORT OF

21   A -- I DON'T KNOW IF "SCHOLARSHIP" IS THE RIGHT WORD, BUT

22   INTERNSHIP OF SORTS THAT THEY FUND WITH THE EFF.  AND THERE IS

23   JUST NO -- THEY CAN'T MAKE ANY CONNECTION BETWEEN THE

24   SUBSTANTIVE ISSUES INVOLVED IN THIS CASE AND THE WORK THAT EFF

25   DOES.  AND FOR THAT REASON IT IS CLEARLY NOT AN APPROPRIATE

1    RECIPIENT.

2          **THE COURT:**  THE FIRST ARGUMENT YOU MADE ABOUT THE

3    CARVE OUT OF 75,000 INITIALLY BEFORE IT GOES TO ANY CLASS

4    MEMBERS, WHAT ABOUT THE FACT THAT THAT 75,000 ONLY COMES INTO

5    PLAY IN THE SECOND TIER.  SO IT ASSUMES THAT THE FIRST TIER

6    CLAIMS HAVE BEEN MADE AND THERE IS FUNDS REMAINING, AND THEN

7    IF THERE IS IN THE SECOND TIER, THAT 75,000 IS ALLOCATED UNDER

8    CY PRES.

9          **MR. PRIDHAM:**  WELL, REGARDLESS OF WHO RECEIVES IT,

10   JUST THE FACT IT IS ALLOCATED, OR THE FACT THAT EFF HAS THE

11   ALLOCATION?

12         **THE COURT:**  WELL, IT SEEMED THAT IT WAS AN ATTEMPT

13   BY THE PARTIES TO NOT RUN AFOUL OF THE ARGUMENT YOU ARE

14   MAKING.  AND THAT IS THAT THE 75,000 IS NOT AVAILABLE FOR CY

15   PRES IF THE 8.5 MILLION, OR WHATEVER FUNDS ARE LEFT, ARE

16   EXHAUSTED IN THE FIRST TIER OF CLAIMS; THAT IS, INDIVIDUALS

17   WHO PURCHASED ON OR BEFORE DECEMBER 31, 2011.

18         **MR. PRIDHAM:**  I UNDERSTAND.  I BELIEVE, AS MR. FRANK

19   EXPLAINED, THE LIKELIHOOD OF THIS FUND EVER BEING EXHAUSTED IS

20   VIRTUALLY NIL.  AND IT IS ALMOST AN ARITHMETIC MAGIC TRICK

21   HERE.

22         YOU SET UP AN INITIAL CONTINGENCY THAT YOU KNOW WILL

23   NEVER EVER OCCUR, AND THEN YOU MAKE THE SECOND CONTINGENCY --

24   YOU MAKE THE SECOND THING THAT YOU WANT TO ACTUALLY HAPPEN,

25   YOU MAKE IT THE SECOND THING IN LINE.  BUT IN REALITY THE

```
 1    FIRST CONTINGENCY WILL NEVER EVER OCCUR.

 2          SO WHAT THEY HAVE, YOU KNOW, NOMINATED AS THE SECOND

 3    CONTINGENCY IS, IN REALITY, THE FIRST THING THAT WILL HAPPEN

 4    IN THIS CASE.  BECAUSE THERE IS NO WAY POSSIBLE THAT THE

 5    CLAIM -- THE FUNDS WILL BE EXHAUSTED BY CLAIMANTS IN THE FIRST

 6    TIER.

 7          SO I BELIEVE THAT THAT IS AN UNFAIR PROBLEM WITH

 8    THIS PARTICULAR AGREEMENT.  AND ALONG WITH THE FACT THAT THE

 9    SUBSTANTIVE ISSUES OF THE EFF, THE WORK THAT IT DOES, ARE JUST

10    SIMPLY NOT RELATED.  AND IF IT WEREN'T FOR THE FRIENDLY

11    RELATIONSHIPS -- AND, AGAIN, I AM NOT DISPARAGING WHAT THE EFF

12    DOES.  THEY ARE A FINE ORGANIZATION.  BUT IF IT WEREN'T FOR

13    THE RELATIONSHIPS THAT THEY ALREADY HAD WITH COUNSEL THEY

14    WOULDN'T HAVE EVEN BEEN NOMINATED AS A RECIPIENT.  A MORE

15    APPROPRIATE CONSUMER PROTECTION ADVOCACY GROUP WOULD HAVE BEEN

16    NOMINATED, I WOULD ASSUME.  AND EFF CERTAINLY ISN'T THAT IN

17    THIS PARTICULAR CASE.

18          IF WE WERE ON AN INTERNET PRIVACY CASE, THEN THEY

19    PROBABLY ARE ONE OF THE LEADING ORGANIZATIONS TO RECEIVE THE

20    CY PRES BENEFIT.

21          THE COURT:  OKAY.

22          MR. PRIDHAM:  DID THAT ANSWER YOUR QUESTION?

23          THE COURT:  YES.  THANK YOU.

24          MR. PRIDHAM:  THE OTHER PROBLEM IN THIS CASE ARE THE

25    CLASS MEMBERS WHO DO HAVE THE UNEXPIRED COUPONS.  THERE ARE
```

1   STATUTORY DAMAGES AVAILABLE UNDER THE CARD ACT WHICH ARE FROM

2   $100 TO $1,000.  THE NOTICE IN THIS PARTICULAR CASE DID NOT

3   GIVE ANY NOTICE TO ANY OF THE CLASS MEMBERS THAT THERE ARE

4   SUCH A THING AS STATUTORY DAMAGES.

5            AND, QUITE FRANKLY, I HAVE BEEN DEALING WITH

6   CONSUMERS SINCE 1990 WHEN I WAS A DEPUTY ATTORNEY GENERAL FOR

7   THE STATE OF NEVADA.  AND I CAN TELL YOU, CONSUMERS NEVER KNOW

8   WHAT THEIR RIGHTS ARE.  AND THEY ARE OFTEN VERY SURPRISED WHEN

9   YOU EXPLAIN TO THEM -- TO THIS DAY WHEN I TELL PEOPLE THAT

10  THERE ARE STATUTORY DAMAGES AND ACTUAL DAMAGES INVOLVED IN

11  MANY OF THE DIFFERENT KINDS OF CASES THAT I PRACTICE IN, I

12  HAVE TO SIT DOWN AND EXPLAIN EVERY SINGLE TIME WHAT STATUTORY

13  DAMAGES MEANS.  AND PEOPLE ARE ALWAYS ASTOUNDED, LIKE, OH,

14  WOW, I JUST GET $100 JUST BECAUSE THEY VIOLATED THE STATUTE,

15  WHETHER I AM DAMAGED OR NOT?

16            YES.  THAT IS A DETERRENT THAT CONGRESS HAS PUT INTO

17  THE STATUTE AND THAT IS ONE PIECE OF THE DAMAGE FORMULA.

18            SO I THINK IT IS UNFAIR THAT CLASS MEMBERS AREN'T

19  EVEN INFORMED OF THIS PARTICULAR RIGHT.  AND THERE IS A

20  SEVENTH CIRCUIT CASE, CRAWFORD VERSUS EQUIFAX, WHICH CLEARLY

21  HOLDS THAT IT IS INAPPROPRIATE TO SUBSTITUTE CY PRES AWARD FOR

22  A STATUTORY DAMAGE AWARD.  YOU CAN'T SUBSTITUTE WHAT SHOULD

23  HAVE BEEN STATUTORY DAMAGES AND PUT IT INTO THE FORM OF A CY

24  PRES DISTRIBUTION.

25            **THE COURT:**  THIS ARGUMENT, THOUGH, ASSUMES THAT THE

1    CARD ACT APPLIES.

2            **MR. PRIDHAM:**  YES, IT DOES ASSUME THAT.  THAT IS

3    CORRECT, YOUR HONOR.

4            **THE COURT:**  HOW ABOUT THE ARGUMENT HERE THAT THIS IS

5    A GOOD FAITH SETTLEMENT BECAUSE IT IS HOTLY DISPUTED WHETHER

6    THE CARD ACT APPLIES.

7            **MR. PRIDHAM:**  I DON'T BELIEVE IT IS GOOD FAITH IN

8    THAT RESPECT, BECAUSE THESE SETTLEMENT AGREEMENTS NEVER AGREE

9    ON ANYTHING EXCEPT THE FACT THAT THERE IS A SETTLEMENT

10   AGREEMENT, WE ARE GOING TO END THE LITIGATION.  THEY NEVER

11   ADMIT TO THE EXISTENCE OF ANY OF THE FACTS.  THEY NEVER ADMIT

12   THAT THE DEFENDANTS EVER DID ANYTHING WRONG.

13           TO NOW COME IN AT THE 11TH HOUR AND TO ARGUE THAT

14   OOPS, THIS WHOLE LAWSUIT THAT WE FILED BASED UPON THE CARD

15   ACT, WHICH HAS QUITE SIGNIFICANT STATUTORY DAMAGES INVOLVED,

16   WELL, IT WAS A BIG MISTAKE.

17           AND THE DEFENDANTS ARE GOING TO SAY YEAH, IT WAS A

18   BIG MISTAKE BUT WE ARE GOING TO PAY YOU $8 MILLION ANYWAY.

19           IN MY OPINION, THAT IS LUDICROUS TO BELIEVE.

20   BECAUSE IF THE CARD ACT DIDN'T APPLY TO THIS CASE, IN MY

21   OPINION, A GOOD DEFENDANT WOULD NOT SETTLE THIS CASE.  THEY

22   WOULD SAY FINE, LET'S GO TO TRIAL.  LET'S DO MOTION.  WE ARE

23   NOT GOING TO PAY YOU $8 MILLION ON THE SUPPOSITION THAT THE

24   CARD ACT APPLIES WHEN WE KNOW FOR A FACT IT DOESN'T.

25           I THINK IT IS JUST DISINGENUOUS TO SUGGEST, AT THIS

1    HOUR, THAT THE CARD ACT ISN'T APPLICABLE TO THESE FACT

2    PATTERNS.

3            AND IF THE CARD ACT IS NOT APPLICABLE, THEN PERHAPS

4    THERE SHOULDN'T BE A SETTLEMENT THEN -- AT LEAST UNDER THESE

5    TERMS -- BECAUSE IT IS ABOUT JUSTICE, I THOUGHT, WAS THE

6    WHOLE POINT OF THESE CONSUMER PROTECTION LAWSUITS.

7            IF IN FACT THE CARD ACT DOESN'T APPLY THIS IS

8    NOTHING MORE THAN AN EXTORTION EFFORT.  AND THERE SHOULDN'T BE

9    ANY APPROVAL OF ANY SETTLEMENT UNDER THOSE TERMS, IN MY

10   OPINION.

11           BUT I THINK IT IS CLEAR THE CARD ACT DOES APPLY.

12   AND IF THE CARD ACT DIDN'T APPLY, THERE IS NO WAY DEFENDANTS

13   WOULD BE SETTLING FOR THIS SORT OF MONEY IN THIS CASE.

14   BECAUSE YOU DON'T GIVE AWAY MONEY OVER BASELESS CLAIMS.  THAT

15   IS CALLED EXTORTION.

16           AND I GUESS IF THE COURT HAS NO MORE QUESTIONS, THE

17   ONLY THING I WOULD OBJECT TO IS THE PRESENTATION OF -- I DON'T

18   KNOW IF THERE IS GOING TO BE A POWERPOINT PRESENTATION OR NOT.

19           WE SAW THE MOTION TO BRING IN THE EQUIPMENT.  WE

20   ASKED FOR A COPY OF ANY SLIDES THEY WERE GOING TO DO, AND THEY

21   REFUSED TO PROVIDE THEM TO US.  BASED UPON THEIR REFUSAL TO

22   PROVIDE US WITH NOTICE OF SLIDES THEY CLEARLY HAD PREPARED I

23   DON'T THINK IT IS APPROPRIATE TO BE ALLOWED TO PRESENT THEM AT

24   THIS TIME.

25           **THE COURT:**  I WILL DEFER ON THAT.  THANK YOU.

1          **MR. PRIDHAM:**  THANK YOU.

2          **THE COURT:**  I APPRECIATE THE COMMENTS.

3          MR. HANSMEIER, DO YOU WISH TO MAKE ANY COMMENTS AT

4    THIS TIME?

5          **MR. HANSMEIER:**  (TELEPHONICALLY) YES, YOUR HONOR.

6    THE COMMENTS I WISH TO MAKE IS JUST TO ILLUSTRATE THE

7    EXPERIENCE THAT MY CLIENT WILL HAVE IN EXPERIENCE FOR -- IN

8    RETURN FOR GIVING UP HER LEGAL CLAIMS AGAINST GROUPON.

9          FOR THE COURT'S RECOLLECTION, MY CLIENT HOLDS TWO

10   EXPIRED GROUPONS.  ONE OF THEM IS A GIFT CARD TO THE GAP AND

11   THE OTHER ONE IS FOR A GIFT CARD TO A LOCAL ICE CREAM STORE

12   HERE IN MINNEAPOLIS.  I WILL USE THE ICE CREAM STORE GROUPON

13   FOR PURPOSES OF THIS ILLUSTRATION.

14         SO THE FIRST STAGE OF THE PROPOSED SETTLEMENT IS

15   SETTLEMENT FUND ONE.  AT THAT STAGE MY CLIENT WILL SUBMIT

16   PAPERWORK TO THE CLAIMS ADMINISTRATOR AND RECEIVE A PIECE OF

17   PAPER IN RETURN, OR A SETTLEMENT VOUCHER.

18         MY CLIENT IS GOING TO PRESENT THIS PIECE OF PAPER TO

19   THE LOCAL ICE CREAM STORE, WHO CAN THEN CHOOSE TO HONOR IT OR

20   IGNORE IT.

21         OF COURSE, MY CLIENT ALREADY POSSESSES AN EXPIRED

22   GROUPON, AND AS AT LEAST ONE OBJECTOR NOTED, SHE CAN PRESENT

23   THIS GROUPON TO THE ICE CREAM STORE AND THE ICE CREAM STORE IS

24   SUPPOSED TO HONOR THE EXPIRED GROUPON FOR THE PURCHASE PRICE.

25   THUS THE SETTLEMENT VOUCHER THAT MY CLIENT WOULD RECEIVE FROM

 1   THE CLAIMS ADMINISTRATOR IS CERTAINLY NO BETTER THAN THE

 2   EXPIRED GROUPON SHE CURRENTLY HOLDS, EXCEPT THAT THE CLAIMS

 3   PROCESS TO RECEIVE THE SETTLEMENT VOUCHER INVOLVES MORE WORK.

 4   AND, OF COURSE, THE SETTLEMENT VOUCHER EXPIRES AFTER A LIMITED

 5   PERIOD OF TIME.

 6          AFTER SETTLEMENT FUND ONE CONCLUDES, THEN WE MOVE ON

 7   TO SETTLEMENT FUND TWO.  AND SETTLEMENT FUND TWO PROVIDES

 8   RELIEF WITH RESPECT TO UNREDEEMED GROUPONS PURCHASED AFTER

 9   DECEMBER 1ST, 2011.  BUT MY CLIENT -- YOU KNOW, THE DEFINITION

10   OF CLASS CUTS OFF AT THAT DATE, AND MY CLIENT DOESN'T HAVE ANY

11   UNREDEEMED GROUPONS THAT WERE PURCHASED AFTER THAT DATE.  SO

12   SHE WILL LITERALLY RECEIVE NOTHING FROM SETTLEMENT FUND NUMBER

13   TWO.

14          THE FINAL STAGE, OF COURSE, IS THE CY PRES

15   DISTRIBUTION.  AND AS THE PRIOR OBJECTOR NOTED, THE ADVOCACY

16   ORGANIZATIONS THAT ARE THE SUBJECT OF THE CY PRES DISTRIBUTION

17   REALLY HAVE NO RELATIONSHIP WHATSOEVER TO CONSUMER FRAUD.  THE

18   EFF, AS THE OBJECTOR NOTED, HAS A LAUDABLE MISSION, BUT SIMPLY

19   HAS NO CONNECTION TO THE ISSUES OF CONSUMER FRAUD.

20          AND FINALLY, YOU KNOW, THERE IS THE INJUNCTIVE

21   RELIEF.  BUT WE HAVE LOOKED OVER THE VARIOUS BRIEFINGS AND

22   MATERIALS SUBMITTED BY THE SETTLING PARTIES AND WE ARE UNABLE

23   TO FIND ANY EXPERT TESTIMONY OR ANY BASIS FOR ASSIGNING ANY

24   VALUE TO THE INJUNCTIVE RELIEF, WHICH ONE COULD CONCLUDE THAT

25   THEY ARE UNABLE TO FIND SOMEONE WHO IS ABLE TO OFFER THAT FORM

1  OF TESTIMONY.  I THINK, AS MANY PEOPLE NOTED IN THE VARIOUS

2  PLEADINGS THAT WERE SUBMITTED IN THIS MATTER, THAT WHAT

3  GROUPON IS OFFERING TO DO FOR INJUNCTIVE RELIEF WILL, FIRST OF

4  ALL, APPLY TO EVERYONE.  AND SECOND IS WHAT THEY ALREADY

5  CURRENTLY DO.

6          MY FINAL COMMENT TO THE COURT WOULD BE THAT THERE

7  APPEARS TO BE A BREAKDOWN IN REPRESENTATION AND IN THE

8  REPRESENTATION OF INTERESTS HERE, BASED ON THE TERMS OF

9  SETTLEMENT FUND TWO.  THE FACT THAT THE SECOND SETTLEMENT FUND

10  WOULD BE EXCLUSIVELY FOR PEOPLE OR FOR PURCHASES OF GROUPONS

11  THAT FALL OUTSIDE THE CLASS DEFINITION SUGGEST THAT DIFFERENT

12  PEOPLE IN THE CLASS WILL BE TREATED DIFFERENTLY.  AND MY

13  CLIENT CAN'T SEE ANY REASON WHY A VERY SUBSTANTIAL PORTION OF

14  THE ENTIRE SETTLEMENT WILL BE GOING TO SOME CLASS MEMBERS,

15  WHILE EXCLUDING HER.

16          AND THE FINAL TROUBLING POINT ABOUT THE SECOND

17  SETTLEMENT FUND THAT MY CLIENT WOULD MENTION TO THE COURT IS

18  THE FACT THAT GROUPON ITSELF HAS THE POWER AND THE ABILITY, BY

19  THE VERY TERMS OF THE SETTLEMENT, TO DIP INTO SETTLEMENT FUND

20  TWO.

21          SO WHEN EVALUATING THE OVERALL BENEFITS TO THE CLASS

22  THAT OCCURS IN THIS CASE, THE COURT CANNOT IGNORE THE FACT

23  THAT, YOU KNOW, AN UNDETERMINED PORTION OF THE SETTLEMENT WILL

24  BE REVERTING BACK TO GROUPON.  AND UNTIL THAT PORTION IS

25  ASCERTAINED, MY CLIENT CANNOT SEE HOW THE COURT CAN FAIRLY

```
 1   ASCERTAIN THE VALUE OF THE SETTLEMENT TO THE CLASS UNLESS THE
 2   APPROPRIATENESS OF AN ATTORNEY'S FEE AWARD.  AND THUS I WOULD
 3   ASK THE COURT TO DELAY ANY RULING ON AN ATTORNEY'S FEE AWARD
 4   PENDING THE RESULT OF KNOWING HOW MUCH GROUPON IS PULLING OUT
 5   OF THE SETTLEMENT FUND NUMBER TWO.
 6        THE COURT:  OKAY.  THANK YOU.  AGAIN I APPRECIATE
 7   THE COMMENTS.
 8        THE OBJECTIONS ARE WELL STATED.  THEY WERE WELL
 9   BRIEFED AND WELL STATED HERE TODAY, SO I APPRECIATE THE
10   APPEARANCES THAT WERE MADE BY THE OBJECTORS.
11        LET ME INVITE THE RESPONSE.
12        MR. STOIA, WOULD YOU LIKE TO SPEAK TO THAT FIRST?
13        IT WOULD BE HELPFUL IF YOU WOULD ADDRESS THE
14   SPECIFIC OBJECTIONS THAT WERE RAISED BY THE FOUR OBJECTORS
15   HERE TODAY.
16        MR. STOIA:  GOOD AFTERNOON, YOUR HONOR.  JOHN STOIA
17   ON BEHALF OF THE CLASS.
18        WELL, THEY WERE RIGHT, WE DID HAVE A WHOLE
19   POWERPOINT READY FOR YOUR HONOR.  I TRIED TO CUT IT DOWN FROM
20   40 SLIDES, DOWN TO 30, DOWN TO 20.  IF THE COURT WOULD LIKE TO
21   SEE IT AT ANY TIME I AM PREPARED TO GIVE IT TO YOU.  BUT I
22   THINK AT THIS POINT THE BEST THING TO DO IS TO ADDRESS THE
23   OBJECTIONS SO FAR THAT HAVE BEEN GIVEN TO THE COURT.
24        I WILL ADDRESS THE FRANK OBJECTIONS -- MR. FRANK'S
25   OBJECTION APPEARING PRO SE, AND ALSO THE ONES BY MR. PRIDHAM,
```

```
 1   MR. SPIES, AND ALSO THE LAST ONE BY MR. HANSMEIER ON BEHALF OF
 2   HIS CLIENT.
 3          I WILL LEAVE FOR MS. WEISS TO DEAL WITH THE GAP
 4   ILLINOIS CASE AND THOSE OBJECTIONS, IF THAT IS OKAY WITH THE
 5   COURT.
 6          YOUR HONOR, WITH DUE RESPECT, I DON'T KNOW IF THE
 7   OBJECTORS HAVE READ THE SAME STIPULATION OF SETTLEMENT THAT I
 8   READ AND THE SAME CASES THAT I HAVE READ, BUT THERE SEEMS TO
 9   BE A FUNDAMENTAL MISUNDERSTANDING OF HOW THIS SETTLEMENT
10   WORKS.
11          AND I GUESS, IF IT IS JUST UNCLEAR IN THE
12   STIPULATION OF SETTLEMENT OR OTHERWISE, BUT IF I MAY CAN I
13   JUST BRIEFLY EXPLAIN TO THE COURT HOW THE FIRST SETTLEMENT
14   FUND WORKS, HOW THE SECOND SETTLEMENT FUND WORKS, AND THEN THE
15   $75,000 CY PRES.  AND THEN, IF THE COURT WOULD LIKE, I WOULD
16   THEN GO THROUGH AND EXPLAIN -- RESPOND TO EACH OF THE VARIOUS
17   LITTLE OBJECTIONS THAT WERE IN THERE.  I DON'T MEAN "LITTLE"
18   TO BE PEJORATIVE, YOUR HONOR, BUT JUST TO THE VARIOUS NUMBER
19   OF OBJECTIONS.
20          SO WHEN WE NEGOTIATED THE SETTLEMENT THE COURT IS
21   AWARE THERE WAS A MAJOR ISSUE LOOMING BETWEEN THE PARTIES.  WE
22   HAD HEARINGS ABOUT IT AND WE SERVED AN ENORMOUS AMOUNT OF
23   DISCOVERY BASED UPON SOME RECENT SUPREME COURT CASES THAT HAVE
24   COME DOWN AND A CALIFORNIA CASE.
25          THE FIRST ONE THAT PUTS FEAR IN ALL CONSUMER
```

1    ATTORNEYS IS THE CONCEPCION CASE.  THE SECOND ONE, WHICH

2    RECENTLY CAME DOWN BY THE U.S. SUPREME COURT, WAS THE

3    COMPUCREDIT CASE.  AND THEN THERE IS NOW A RECENT MERCEDES

4    BENZ CASE SAYING THAT THE ARBITRATION PROVISIONS ALSO APPLY TO

5    THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT.

6            BUT IN SPITE OF THAT THE PARTIES WENT THROUGH AND

7    BEGAN TO DO EXTENSIVE ARBITRATION RELATED DISCOVERY.  AS THE

8    COURT IS AWARE, GROUPON HAS AN ARBITRATION PROVISION IN THEIR

9    GROUPONS.  THEY HAVE ALWAYS HAD THE ARBITRATION PROVISION

10   THERE, WHERE NOW EVERY COMPANY HAS THEM.  THEY ALSO HAVE A

11   CLASS ACTION WAIVER PROVISION THERE.

12           YET, DESPITE THAT WE PROCEEDED TO GO FORWARD WITH

13   ARBITRATION RELATED DISCOVERY.  AS YOU KNOW WE HAD HEARINGS ON

14   THAT.  A LOT OF DISCOVERY HAS BEEN SERVED.  HUNDREDS OF

15   INTERROGATORIES WERE RESPONDED TO.  AND ULTIMATELY THE PARTIES

16   WERE ABLE TO SETTLE THIS CASE.

17           I BELIEVE THAT IS A VERY POSITIVE THING FOR THE

18   CLASS, BECAUSE I BELIEVE THAT ABSENT THIS SETTLEMENT THE CLASS

19   WOULD GET NOTHING.  AND THE CLASS WOULD THEN HOPE THAT IF THEY

20   HAD AN EXPIRED GROUPON OR THEY HAD A VOUCHER THAT WAS NEVER

21   USED OR IF THEY HAD SOME PROBLEM WITH IT, THAT MAYBE IF THEY

22   WENT BACK TO THE MERCHANT THEY WOULD NOW GET IT; VERSUS NOW

23   THERE IS SOMETHING THAT THE CLASS SERIOUSLY GET, AND IT IS

24   REAL RELIEF.

25           SO WHAT WE DID IN THE STIPULATION OF THE SETTLEMENT

1    IS THIS.  WE SET ASIDE AN $8 1/2 MILLION COMMON FUND.  FROM

2    THAT $8 1/2 MILLION, A REQUEST FOR ATTORNEY'S FEES, CLAIMS

3    ADMINISTRATION, NOTICE COSTS AND OTHERWISE WOULD BE DEDUCTED,

4    LEAVING A NET FUND OF, LET'S SAY, APPROXIMATELY $6.-SOME

5    MILLION, DEPENDING WHAT THE COURT DOES WITH FEES.

6            SO THE WAY THAT THE SETTLEMENT IS STRUCTURED IS

7    THIS.  YOU HAVE THE FIRST SETTLEMENT FUND.  AND THE FIRST

8    SETTLEMENT FUND IS MEANT TO DEAL SOLELY WITH THOSE PEOPLE THAT

9    HAVE A SPECIFIC TYPE OF GROUPON VOUCHER.  IT IS UNREDEEMED.

10   THAT MEANS THEY HAVE NEVER GONE TO THE MERCHANT TO USE IT.

11   THEY PRINTED IT OUT, THEY STUCK IT IN THEIR DRAWER.  AS MS.

12   WEISS LIKES TO SAY, THEY STUCK IT IN THEIR CLOSET -- I AM NOT

13   SURE WHY.  WHATEVER THEY DID, FOR WHATEVER REASON, THEY DIDN'T

14   REDEEM IT.  AND NOW THE VOUCHER IS EXPIRED.

15           AND AS WE ALLEGE IN OUR COMPLAINT, MANY GROUPON

16   VOUCHERS WERE SET WITH VERY SHORT EXPIRATION PERIODS, UNDER 30

17   DAYS, UNDER 20 DAYS, UNDER 10 DAYS.  AND AS WE PUT IN OUR

18   AMENDED COMPLAINT, THE REASONS WHY THEY DID THAT, TO CREATE

19   THAT BUYING FRENZY.

20           SO WHAT WE DID IS SAY OKAY, AFTER WE GET RID OF THE

21   ATTORNEY'S FEES AND OTHER COSTS AND WHATEVER POPS UP, WE ARE

22   GOING TO HAVE TWO SETTLEMENT FUNDS.  THE FIRST SETTLEMENT FUND

23   IS MEANT TO DEAL WITH THOSE PEOPLE WHO HAVE UNREDEEMED EXPIRED

24   VOUCHERS.

25           NOW WHAT WE ARE GOING TO DO IS WE ARE GOING TO ALLOW

```
 1   THOSE PEOPLE TO GET THE BENEFIT OF THEIR BARGAIN.  SO WHAT A
 2   CLASS MEMBER DOES, IF THEY HAVE ONE OF THOSE VOUCHERS -- AND
 3   SO FAR 48,000 PEOPLE HAVE ALREADY FILED AND WE HAVEN'T EVEN
 4   SENT OUT THE NOTICE TO START FILING CLAIMS.  THAT IS 48,000
 5   PEOPLE WHO BELIEVE THAT THIS IS A SERIOUS AND A VERY GOOD
 6   SETTLEMENT BECAUSE WE HAVEN'T EVEN TOLD THEM THEY CAN FILE
 7   CLAIMS YET.
 8           THEY SENT IN THE CLAIM FORM.  THEY GET AN ELECTRONIC
 9   VOUCHER -- THEY GET ANOTHER GROUPON, EITHER ELECTRONICALLY OR
10   IF THEY WANT THEY CAN SAY BY MAIL, HOWEVER THEY WANT TO
11   RECEIVE IT.  IT GETS E-MAILED TO THEM.  THEY PRINT IT OUT.
12   THEN THEY HAVE 130 DAYS TO GO OUT, BACK TO THE MERCHANT, AND
13   GET WHAT THEY ORIGINALLY ASKED FOR.
14           SO, FOR EXAMPLE, IF IT WAS $100 GROUPON, RIGHT?  $50
15   WAS PAID IN CASH, 50 MORE IN PROMOTIONAL VALUE, AND IT WAS AT
16   NORDSTROMS, THEY NOW CAN GO TO NORDSTROMS AND SAY, I WANT MY
17   $100 BACK.
18           AND CONTRARY TO WHAT THE OBJECTORS ARE SAYING, THERE
19   IS NO REQUIREMENT THAT THOSE MERCHANTS HONOR THOSE EXPIRED
20   VOUCHERS.  IN FACT, WE ALLEGE IN OUR COMPLAINT, WHICH IS TRUE,
21   IF A GROUPON DOESN'T -- IF A MERCHANT DOESN'T HONOR IT, GUESS
22   WHAT?  THEY GET TO KEEP THAT $50.  SO THEY ARE NOT
23   INCENTIVIZED TO HONOR IT ABSENT THIS SETTLEMENT.  OKAY?
24           SO YOU HAVE THE $100.  THEY GO TO THE MERCHANT.
25   RIGHT?  THE MERCHANT SAYS NO, I AM NOT GOING TO HONOR THAT
```

1    SETTLEMENT TICKET AS A RESULT OF THIS SETTLEMENT.

2         IF THEY DON'T HONOR IT, THEN THE CLASS MEMBER SENDS

3    IT BACK TO US, AND WE GIVE THEM BACK 100 PERCENT OF WHAT THEY

4    PAID, THE $50, PLUS 20 PERCENT MORE FOR THE PROMOTIONAL VALUE.

5         SO UNDER MY EXAMPLE IT WOULD BE YOUR $50 THAT YOU

6    PAID IN, PLUS 20 PERCENT OF THE OTHER 50, SO ANOTHER $10.  SO

7    YOU WOULD GET $10 MORE THAN YOU ORIGINALLY PAID.

8         **THE COURT:**  WHAT ABOUT THE ARGUMENT MADE BY

9    MR. FRANK THAT FOR THE VAST MAJORITY OF PEOPLE THEY CAN

10   ALREADY TAKE THEIR UNREDEEMED EXPIRED VOUCHERS TO, SAY,

11   NORDSTROMS AND GET THE $50 WORTH OF GOODS.

12        **MR. STOIA:**  PART OF IT -- HALF OF HIS ARGUMENT IS

13   RIGHT AND HALF OF IT IS WRONG.  HALF OF HIS ARGUMENT IS RIGHT.

14   THEY CAN TAKE IT THERE AND TRY TO REDEEM IT, BUT THERE IS NO

15   GUARANTEE THAT NORDSTROM WILL REDEEM IT.

16        IN FACT, WE PUT INTO THE RECORD DECLARATIONS FROM

17   OUR OWN CLIENTS WHO HAVE ATTEMPTED TO GO AND REDEEM AND HAVE

18   BEEN TOLD NO, WE ARE NOT GOING TO REDEEM THAT.  THAT WAS TWO

19   YEARS AGO.

20        **THE COURT:**  THERE IS NO GUARANTEE NOW.

21        **MR. STOIA:**  THERE IS NO GUARANTEE AT ALL.

22        **THE COURT:**  IT IS JUST THAT UNDER THE SETTLEMENT THE

23   CLAIMANT WOULD GET REIMBURSED THROUGH --

24        **MR. STOIA:**  THAT IS HOW WE DEALT WITH IT.

25        SO IF SOMEBODY HAS -- LET'S SAY SOMEBODY WENT TO A

1    RESTAURANT AND THEY HAVE A $100 GIFT CERTIFICATE, YOU KNOW,

2    THEY PAID 50, THEY HAVE $100 AND THEY GO TO THE RESTAURANT TO

3    USE IT.  AND AT THE END THE WAITER LOOKS AT IT AND SAYS WELL,

4    THAT WAS A YEAR AGO.  IT HAS EXPIRED.

5              NOW, THIS IS BEFORE THE SETTLEMENT.

6              THERE IS NO OBLIGATION TO DO IT.  I DON'T CARE WHAT

7    IT SAYS ON GROUPON'S WEBSITE, THERE IS NOTHING ON THE

8    MERCHANT'S WEBSITE TO SAY YOU HAVE TO HONOR THIS.  AND THAT

9    THEY WILL IN FACT DO IT.

10             AND WE HEARD MANY INSTANCES WHERE CLASS MEMBERS IN

11   FACT TRIED TO DO THAT AND THEY DIDN'T.  WHAT DOES THE

12   SETTLEMENT GIVE THEM?  THE SETTLEMENT GIVES THEM A GUARANTEE.

13             **THE COURT:**  WHAT ABOUT THE ARGUMENT THAT, AS IS THE

14   CASE WITH MR. FRANK, HE JUST SIMPLY CALLED GROUPON AND

15   RECEIVED GOOD SERVICE AND GOT -- THAT THEY COULD GET A REFUND

16   OR A RENEWED --

17             **MR. STOIA:**  YEAH, MR. FRANK, HE HAD TWO OR THREE

18   GROUPONS, IF I REMEMBER CORRECTLY.  ONE OF THEM WAS ONE THAT

19   HE PRINTED RECENTLY, DURING THE PENDENCY OF THE APPROVAL AND

20   THE -- THIS HEARING, WHICH SEEMED A BIT SUSPECT.

21             BUT GROUPON HAS -- AND IT SAYS RIGHT ON THEIR

22   WEBSITE, THEY HAVE WHAT THEY CALL THE GROUPON PROMISE; WHICH

23   IS, IF YOU HAVE ANY PROBLEM WITH YOUR GROUPON AND YOU ARE

24   DISSATISFIED OR WHATEVER, LIKE ANY GOOD COMPANY, YOU GIVE US A

25   CALL AND WE WILL TRY TO WORK IT OUT.  RIGHT?

```
 1            BUT AS WE PUT IN OUR BRIEF, THAT IS A PROMISE FOR
 2   DISSATISFACTION WITH YOUR GROUPON.  DISSATISFACTION THAT YOU
 3   DIDN'T LIKE THE PRODUCT, YOU DIDN'T LIKE THE SERVICE, YOU
 4   DIDN'T LIKE SOME ASPECT OF THE WHOLE TRANSACTION.  THEY WERE
 5   RUDE TO YOU, WHATEVER IT MAY BE.  THAT IS GOOD BUSINESS SENSE
 6   BY GROUPON.
 7            BUT WHAT THE GROUPON PROMISE DOES NOT SAY AND WHAT
 8   THE GROUPON WEBSITE DOES NOT SAY IS THAT, OKAY, IF YOU DON'T
 9   GO OUT AND YOU DON'T USE IT WE WILL GIVE YOU BACK YOUR MONEY.
10            IT IS NOT A GUARANTEE OF A REFUND.
11            IN FACT, YOUR HONOR, WE HAVE A DECLARATION IN THE
12   RECORD FROM THE -- I THINK THE VICE PRESIDENT OF GROUPON FOR
13   CUSTOMER SERVICE WHO SPECIFICALLY DEALS WITH THE GROUPON
14   PROMISE, MR. HARROW.  AND MR. HARROW SAYS:  THE GROUPON
15   PROMISE -- THE GROUPON PROMISE IS INTENDED TO ENSURE CUSTOMERS
16   THAT IF A CONSUMER PURCHASES A GROUPON AND USES THE GROUPON
17   AND IS DISSATISFIED WITH THE GOODS AND SERVICES RECEIVED FROM
18   THE MERCHANT, GROUPON WILL MAKE EVERY EFFORT TO MAKE IT RIGHT.
19            BUT IT DOES NOT MEAN THAT IT APPLIES TO PEOPLE WITH
20   EXPIRED, UNREDEEMED VOUCHERS.  THAT IS WHAT THE FIRST
21   SETTLEMENT FUND IS INTENDED TO DO.
22            SO GOING BACK TO THAT INITIAL POT OF MONEY, THE
23   FIRST FUND.  THE CLASS MEMBER GOES TO THE MERCHANT, THE
24   MERCHANT SAYS YOU GOT A SETTLEMENT TICKET.  WE RECEIVED THE
25   NOTICE, EXHIBIT 10 TO THE STIPULATION OF SETTLEMENT.  WE ARE
```

1    GOING TO HONOR THIS.

2              EVERYBODY IS MADE WHOLE.  RIGHT?

3              YOU NOW HAVE AN EXPIRED GROUPON THAT IS NOW VALID

4    AGAIN, IT HAS BEEN BROUGHT BACK TO LIFE.  YOU GOT WHAT YOU

5    WANTED.  YOU SPENT $50, AND THEY GAVE YOU $100 WORTH OF

6    SERVICES.  EVERYBODY IS HAPPY.

7              THE MERCHANT REFUSES, YOU GET YOUR $50 BACK PLUS

8    ANOTHER 20 PERCENT ON TOP OF IT.

9              NOW, WHAT DO YOU DO ABOUT THE PEOPLE -- THE

10   BUSINESSES THAT ARE OUT OF BUSINESS, ESPECIALLY DURING THE

11   ECONOMY AS IT CURRENTLY IS, AND ESPECIALLY DURING THE CLASS

12   PERIOD.

13             THAT IS SIMPLE.  WHEN A CLASS MEMBER GETS THEIR

14   CLAIM FORM ALL THEY DO IS THEY SEND IT IN.  COMPANY IS OUT OF

15   BUSINESS, THEY GET SENT A CHECK.  IT IS RIGHT THERE IN THE

16   STIPULATION OF SETTLEMENT.

17             I BELIEVE IF COUNSEL HAD READ THE STIPULATION A

18   LITTLE MORE CAREFULLY THEY WOULD SEE THAT IS EXACTLY WHAT IT

19   SAYS.

20             SO 6 -- WHATEVER YOU WANT TO CALL IT, $6 1/2 MILLION

21   IS IN A FUND.  THE FIRST THING THAT HAPPENS IS THE CLASS

22   MEMBERS CLAIM INTO THAT, GET THE VOUCHER.  THEY DON'T GET WHAT

23   THEY WANT, THEY GET THE REFUND.

24             AFTER ALL REFUNDS ARE PAID, EVERY REFUND IS PAID TO

25   EVERY SINGLE CLASS MEMBER WHO SEEKS A REFUND THEN, AND ONLY

1    THEN, DO YOU GO TO THE POSSIBILITY OF CY PRES AND THE

2    POSSIBILITY OF A SETTLEMENT FUND, THE SECOND ONE.

3              **THE COURT:**  DOESN'T IT APPEAR THAT THERE IS GOING TO

4    BE A LOT OF THE FUND LEFT FOR TIER TWO GIVEN THE INFORMATION

5    YOU HAVE AS TO THE NUMBERS?

6              **MR. STOIA:**  NO, YOUR HONOR, I DON'T KNOW THERE IS

7    GOING TO BE -- THAT IS IN FACT GOING TO BE TRUE.

8              LET ME RUN THROUGH A FEW NUMBERS FOR YOU.  AS OF

9    NOON TODAY -- MAYBE IT WAS A LITTLE BIT EARLIER IN THE

10   MORNING.  BUT AS OF TODAY, AND SPEAKING WITH RUST, WHO TRACKS

11   ALL OF THE NUMBER OF CALLS AND CLAIMS AND ALL OF THAT, LET ME

12   TELL YOU WHAT THE CLASS HAS DONE SO FAR, WHY WE THINK THE

13   FIRST SETTLEMENT FUND WILL BE UTILIZED HEAVILY.  AND THEN WHY

14   THE SECOND SETTLEMENT FUND, IN MY OPINION, I BELIEVE THERE

15   WON'T BE ANY LEFT.  AND I WILL TELL YOU WHY.

16             SO FAR WE HAVE 48,059 CLAIMS THAT HAVE BEEN FILED

17   WITH THE CLAIMS ADMINISTRATOR.  AND NOT -- NO NOTICE HAS GONE

18   OUT TO THE CLASS THAT THEY CAN EVEN SUBMIT THEIR CLAIMS.

19             IF THE PARTIES HAD READ -- OR THE OBJECTORS HAD READ

20   THE STIPULATION OF SETTLEMENT, THE WAY IT READS IS WHEN THIS

21   COURT APPROVES THIS SETTLEMENT AND IT GOES EFFECTIVE, THEN A

22   NOTICE WILL THEN GO TO THE CLASS MEMBERS SAYING THE COURT HAS

23   APPROVED IT, TIME TO FILE YOUR CLAIM.  YOU CAN DO IT ONLINE,

24   YOU CAN MAIL IT IN, YOU CAN SEND IT BY FAX, SEND IT BY

25   COURIER, HOWEVER YOU WANT TO GET IT TO US.  AND THEN WE WILL

1    SEND YOU A SETTLEMENT TICKET.

2         SO WE HAVE 48,000 AND THIS COURT HASN'T EVEN

3    APPROVED IT.  WE EXPECT THAT TO GROW SUBSTANTIALLY.  THERE IS

4    A WHOLE OTHER SET OF E-MAILS IS GOING TO GO OUT TO 14 MILLION

5    CLASS MEMBERS.  AND MANY CLASS MEMBERS -- AND WE HAVE SPOKEN

6    TO THEM -- KNOW THEY CAN'T FILE THEIR CLAIM YET.

7         TO DATE THE CLAIM CENTER HAS HAD, LIKE, 10,000 PHONE

8    CALLS APPROXIMATELY.  10,000 PHONE CALLS FROM THE CLASS

9    MEMBERS, AND OVER 8,000 E-MAIL INQUIRES.

10        I MYSELF HAVE RECEIVED WAY MORE E-MAILS THAN I

11   WANTED.  THAT IS THE GREAT THING ABOUT HAVING YOUR E-MAIL IN

12   THE PUBLIC BARRED ON YOUR WEBSITE.

13        WE HAVE ALSO -- TO DATE THE SETTLEMENT WEBSITE WE

14   SET UP HAS 4 MILLION VIEWS.  4 MILLION PEOPLE HAVE GONE AND

15   VISITED THAT WEBSITE.

16        IT IS A VERY SIMPLE WEBSITE.  IF THE COURT HAS

17   LOOKED AT IT, IT SAYS HERE ARE THE DATES, HERE IS WHAT THE

18   COURT IS GOING TO DO.  YOU WANT TO STAY IN, YOU DON'T NEED TO

19   DO ANYTHING, WE WILL SEND YOU A NOTICE IF THE COURT APPROVES

20   IT.

21        SO CLASS MEMBERS ARE INTERESTED IN THE SETTLEMENT.

22   48,000 SO FAR, CONTRARY TO WHAT THE OBJECTORS' COUNSEL SAY,

23   LIKE THE SETTLEMENT.  THEY HAVE ALREADY FILED THEIR CLAIMS.

24   THEY ARE READY TO PARTICIPATE.  WE ARE GOING TO SEND OUT

25   14 MILLION MORE E-MAILS TO CLASS MEMBERS AND WE WILL SEE HOW

1   MANY MORE CLAIMS COME IN.  100,000.  300,000.  WE DON'T KNOW.

2   BUT WE WILL BE SURE THAT THEY ARE SENT OUT AND THEY WILL BE

3   SUBMITTED.

4         LET'S ASSUME THAT AFTER WE SEND OUT THE NEXT GROUP,

5   AFTER ALL OF THE REFUNDS, EVERYTHING IS PAID, THERE IS

6   $2 MILLION LEFT.  OKAY?  THEN WHAT HAPPENS?

7         WE HAVE SET UP AND NEGOTIATED THE SETTLEMENT THAT WE

8   WOULD THEN TAKE -- IF THERE IS $2 MILLION LEFT IN THE FIRST

9   FUND, WE WOULD IMMEDIATELY TAKE $75,000 AND SET IT ASIDE FOR

10  CY PRES.

11        SO FIRST THE REFUNDS HAVE TO BE PAID.  IF THERE IS

12  ZERO MONEY LEFT THERE IS NO CY PRES, THERE IS NO SECOND

13  SETTLEMENT FUND.  BUT IF AFTER THE REFUNDS ARE PAID AND THERE

14  IS MONEY LEFT, 75,000 IS SET ASIDE, IF THERE EXISTS THAT MUCH.

15  IN OTHER WORDS, IT HAS TO BE MORE THAN 75.

16        **THE COURT:**  HOW ABOUT THE ARGUMENT THAT THE SECOND

17  SETTLEMENT FUND DOESN'T EVEN FIT WITHIN THE CLASS DEFINITION?

18        **MR. STOIA:**  AN INTERESTING ARGUMENT BUT AN INCORRECT

19  ARGUMENT, YOUR HONOR.  LET ME TELL YOU WHY.

20        PEOPLE THAT GET TO GO INTO THE SECOND SETTLEMENT

21  FUND, CONTRARY TO WHAT COUNSEL REPRESENTED, ARE CLASS MEMBERS.

22  AND HERE IS HOW IT WORKS.

23        ANY CLASS MEMBER, FOR INSTANCE FROM NOVEMBER 2008

24  UNTIL DECEMBER 1, 2011, WHO THEREAFTER BUYS A GROUPON -- WHICH

25  I AM SURE MS. WEISS COULD GIVE YOU, YOU KNOW, THE STATISTICS.

1    THERE WERE ALL -- PEOPLE USE THEM CONSTANTLY, VERY HIGH

2    NUMBERS.  THEREAFTER HAVE A PROBLEM WITH THEIR GROUPON, THEY

3    CAN CLAIM INTO THAT SECOND SETTLEMENT FUND.

4          IT IS A LOT DIFFERENT.  YOU HAVE TO UNDERSTAND WHAT

5    THAT SAYS.  AND, YOUR HONOR, I WAS JUST GOING TO GRAB THE

6    LANGUAGE OF IT.

7          HERE IS WHY THE SECOND SETTLEMENT FUND IS DIFFERENT

8    THAN THE CURRENT GROUPON PROMISE WHERE THEY GO:  WE WILL TRY

9    TO MAKE YOU HAPPY.

10          OKAY?  FIRST OF ALL, A CLASS MEMBER -- RIGHT -- IT

11   IS CURRENT PEOPLE.  IT IS NOT, AS ONE OF THE OBJECTORS SAID

12   THAT HIS CLIENT CAN'T DO BECAUSE SHE DOESN'T HAVE ANY EXPIRED

13   ONES.  IT IS ANY GROUPON VOUCHER YOU BUY.  YOU CAN HAVE -- ANY

14   PERSON CAN SEND A CLAIM IN THAT IS A CLASS MEMBER THAT BOUGHT

15   ONE AFTER DECEMBER 1, 2011.  IT CAN BE EXPIRED.  DIDN'T HAVE

16   TO BE.  IT CAN BE FILED FOR ANY REASON.

17          AND IF YOU READ THE STIPULATION OF SETTLEMENT, WHAT

18   IT SAYS, IT SAID A CLASS MEMBER CAN SUBMIT A CLAIM FOR ANY

19   VOUCHER FOR ANY REASON.  NO QUESTIONS ASKED.

20          AND, AS YOU CAN IMAGINE, WE FOUGHT FAIRLY HARD OVER

21   THAT.  BUT IT IS NO QUESTIONS ASKED.  IT IS AUTOMATIC.  THERE

22   IS NO REJECTION BY THE CLAIMS ADMINISTRATOR.

23          SO AGAIN, BY WAY OF EXAMPLE, IF ONE OF THE CLASS

24   MEMBERS BUYS ONE NEXT WEEK AND THE COURT APPROVES THE

25   SETTLEMENT.  RIGHT?  IT IS AFTER DECEMBER 1, 2011, AND THEY

```
1   GET IT.  AND THEN TWO DAYS LATER THEY THINK, YOU KNOW WHAT?  I

2   AM NOT DRIVING ALL THE WAY TO NORTH COUNTY TO GO OUT TO

3   WHATEVER STORE AND REDEEM THIS.

4           THEY CAN EITHER JUST SEND IT RIGHT INTO THE CLAIMS

5   ADMINISTRATOR AND SAY, I DON'T WANT IT.

6           THEY DON'T HAVE TO GIVE AN EXPLANATION.

7           AND THEY GET THEIR MONEY BACK.

8           THE REASON THAT WAS SET THERE WAS FOR THOSE CLASS

9   MEMBERS WHO DID NOT HAVE EXPIRED UNREDEEMED GROUPONS, THE

10  FIRST FUND, THEN COULD GO AND CLAIM INTO THE SECOND FUND.

11          NOW, YOU SAY, YOUR HONOR, WHY CAN'T THEY -- WHAT

12  RELIEF DO THEY GET?  WHY AREN'T THEY IN THE FIRST FUND?

13          WELL, THE REASON IS, YOUR HONOR, BECAUSE THE VAST,

14  VAST MAJORITY OF CLASS MEMBERS GOT THEIR GROUPONS AND THEY

15  USED THEM.  WE PUT EVIDENCE INTO THE RECORD THAT THE

16  REDEMPTION RATE IS EXTREMELY HIGH.  MOST PEOPLE GET THEM, BUY

17  THEM, AND USE THEM.  SO THEY ALREADY GOT THE BENEFIT OF THEIR

18  BARGAIN, WHAT THEY WANTED.  BUT WE SET UP A MECHANISM FOR THE

19  SECOND SETTLEMENT FUND TO ALLOW THEM TO GET RELIEF.  IF FOR

20  ANY REASON THEY ARE NOT HAPPY WITH THE GROUPON THEY DON'T HAVE

21  TO CALL UP GROUPON, THEY JUST SEND IT IN.

22          THE COURT:  WHY WOULD IT BE FAIR TO CARVE OUT 75,000

23  FROM THAT GROUP?  IN OTHER WORDS, SHOULDN'T SECOND TIER

24  CLAIMANTS HAVE ACCESS AND POTENTIALLY EXHAUST THE ENTIRE

25  SETTLEMENT FUND BEFORE ANY CY PRES DISBURSEMENT?
```

1      **MR. STOIA:**  THE WAY THAT IT WORKS, YOUR HONOR, IS

2  THAT IF AT THE END OF THE FIRST FUND, IF THERE IS LESS THAN

3  75,000 THEN IT DOESN'T GET DISBURSED.  THEN WE JUST DEAL WITH

4  IT.

5          IF IT IS MORE THAN $75,000 -- THE REASON WHY WE TOOK

6  IT OUT FIRST WAS TO TRY TO ADVANCE WHAT WE BELIEVE -- "WE"

7  BEING PLAINTIFF'S COUNSEL -- TO ADVANCE THE INTEREST OF THE

8  CLASS IN CHOOSING THE TWO CY PRES RECIPIENTS.

9          AND WHAT IS INCORRECT OR THE IMPRESSION THAT IS

10  WRONG BY THE OBJECTORS HERE IS THEY DON'T UNDERSTAND A NUMBER

11  OF THINGS ABOUT THE CY PRES AND HOW THEY WERE CHOSEN.

12          FIRST OF ALL, THE ELECTRONIC FRONTIER FOUNDATION WAS

13  CHOSEN BY ME.  IT WAS NOT CHOSEN BY DLA PIPER.  WHEN I

14  PROPOSED IT TO THE DEFENDANTS THEY WERE, LIKE, WHO ARE THEY?

15  SEND US THE INFORMATION.

16          SO WHICHEVER OBJECTOR WAS SAYING THERE IS SOME VAST

17  CONSPIRACY BETWEEN MS. WEISS AND DLA PIPER AND INTERNSHIPS AND

18  ALL OF THAT, THEY HAD NO IDEA, WHEN I PROPOSED IT, WHO EFF

19  WAS.  THAT WAS MY CHOICE BASED UPON YEARS OF WATCHING THE WORK

20  OF EFF.

21          I HAVE NEVER WORKED WITH EFF.  I HAVE NEVER DONE

22  ANYTHING WITH THEM.  THERE WAS A CASE 10 YEARS AGO OR EIGHT

23  YEARS AGO WITH MY FIRM.  BUT NOTHING WITH THEM, NO FINANCIAL

24  RELATIONSHIP OR OTHERWISE.  I AM VERY SUPPORTIVE OF THEIR

25  WORK.

```
 1            THE OTHER ONE, THE CENTER FOR DEMOCRACY AND
 2   TECHNOLOGY -- WHO SOMEONE ALSO ACCUSES DLA PIPER, AGAIN, FOR
 3   BEING INVOLVED WITH -- THAT WAS CHOSEN BY THEIR CLIENT,
 4   GROUPON, NOT BY DLA PIPER.
 5            I DON'T HAVE TO ARGUE FOR MS. WEISS, I JUST THINK IT
 6   IS KIND OF HUMOROUS THAT THEY ARE ACCUSING DLA PIPER, AND WE
 7   EACH PICKED ONE.  THAT IS HOW WE DID IT.
 8            THE COURT:  HOW ARE THOSE TWO THEN RELATED TO THE
 9   PURPOSES OF THIS CLASS ACTION LAWSUIT?
10            MR. STOIA:  HOW ARE THEY?
11            THE COURT:  YES.
12            MR. STOIA:  LET ME EXPLAIN THAT TO YOU.
13            ASSUMING THERE IS $75,000 LEFT, HALF WOULD GO TO EFF
14   AND HALF WOULD GO TO THE CENTER FOR DEMOCRACY AND TECHNOLOGY.
15            AND AS WE STATED IN OUR PAPERS, THIS CASE IS NOT
16   LIKE KELLOGG WHICH RECENTLY CAME DOWN, YESTERDAY.  AND IT IS
17   NOT LIKE NACHSHIN -- IF THAT IS HOW YOU SAY IT CORRECTLY.  AND
18   IT IS NOT LIKE THE ISSUES THAT WERE RAISED IN SIX MEXICAN
19   WORKERS.  IN FACT, THIS CASE IS QUITE DIFFERENT FROM THAT,
20   YOUR HONOR.
21            LET ME JUST EXPLAIN HOW THEY ALIGN.
22            GROUPON USERS ARE INTERNET SAVVY PEOPLE.  THEY ARE
23   PEOPLE WHO SET UP ACCOUNTS ONLINE.  THEY ARE WATCHING FOR
24   DAILY DEALS.  THEY ARE GETTING E-MAILS, THEY ARE GETTING ALL
25   OF THIS STUFF FROM GROUPON.  THEY ARE ONLINE CONSTANTLY.
```

1          WE, OF COURSE, SENT NOTICE TO THEM, HAD A HUGE

2    RESPONSE.  AND THAT CONFIRMED WHAT WE THOUGHT.

3          ELECTRONIC FRONTIER FOUNDATION DOES A NUMBER OF

4    THINGS.  IT IS NOT JUST ABOUT INTERNET PRIVACY.  THEY ARE

5    ALWAYS ADVOCATING ON BEHALF OF INTERNET USERS.

6          SO, FOR EXAMPLE, EFF HAS DONE A NUMBER OF DIFFERENT

7    THINGS, LIKE ISSUING WHITE PAPERS.  THEY ISSUE WHITE PAPERS ON

8    CUTTING EDGE ISSUES OF LAW AND TECHNOLOGY.  THEY HAVE CASES

9    THAT THEY BRING ON BEHALF OF IMPROPER GOVERNMENT SURVEILLANCE,

10   AND HOW TO PROTECT YOURSELF FROM SURVEILLANCE.  HOW TO KEEP

11   THE INTERNET OPEN FOR ALL INTERNET USERS.

12         ONE OF THE THINGS THAT THEY DO IS THEY CHASE DOWN

13   WHAT THEY CALL COPYRIGHT TROLLS, WHO I BELIEVE SOME OF THE

14   COUNSEL FOR THE OBJECTORS DO THAT SORT OF WORK.

15         THE CENTER FOR DEMOCRACY AND TECHNOLOGY IS ANOTHER

16   ORGANIZATION.  I WILL JUST QUOTE FROM THEIR WEBSITE AND THEIR

17   501(C)(3), THAT THEY ARE A NONPROFIT PUBLIC POLICY

18   ORGANIZATION AND LEADING INTERNET FREEDOM ORGANIZATION WORKING

19   ON THE CRITICAL EDGE OF POLICY INNOVATION.  THEY HAVE LED A

20   SUCCESSFUL CAMPAIGN TO ENSURE THE AVAILABILITY OF STRONG

21   ENCRYPTION, FOSTERING PRIVACY, NETWORK SECURITY AND ROBUST

22   E-COMMERCE.

23         AGAIN, GROUPON USERS.

24         THEY HAVE ALSO DONE GROUNDBREAKING ANTI-SPYWARE

25   COALITIONS, WHICH HAS WIDELY BEEN ACCREDITED WITH CURTAILING

```
 1   MALWARE AND IMPROVING THE TRUST AND SECURITY ON THE WEB.
 2          AGAIN, E-COMMERCE PURCHASES.
 3          SO IN CONTRAST, YOUR HONOR, TO KELLOGG, WHERE THEY
 4   WERE GIVING TO SOME UNKNOWN GROUPS WHO WERE GOING TO HAND
 5   OUT -- HAND OUT, I THINK, EXPIRED POST TOASTIES, OR SOMETHING
 6   OF THAT NATURE.  OR SIX MEXICAN WORKERS WHERE IT WAS TO
 7   MEXICAN HUMANITARIAN AID ORGANIZATIONS.  OR COMING IN AND
 8   SAYING TO THE COURT, WE WILL LET YOU KNOW, WE WILL COME BACK
 9   AND PETITION YOU.  WE HAVE COMPLIED WITH KELLOGG.  WE HAVE
10   IDENTIFIED THE GROUPS:  EFF AND THE CENTER FOR DEMOCRACY AND
11   TECHNOLOGY.  WE HAVE IDENTIFIED THE AMOUNT: $75,000.  PLUS
12   RESIDUAL IF THERE IS ANY.
13          THEY ARE ALIGNED WITH CLASS MEMBERS.  THEY PROTECT
14   THE INTERNET, SOFTWARE, ANTI-SURVEILLANCE, TRYING TO PROMOTE
15   THE SAFETY AND THE SECURITY OF THE INTERNET FOR USERS, COMMON
16   USERS, FROM GOVERNMENT INTRUSION, COPYRIGHTS, IMPROPER THINGS.
17   WHAT THESE PEOPLE DO.  THEY ARE ONLINE, BUYING AND SELLING,
18   WHETHER IT IS GROUPON OR AMAZON OR OTHERWISE.
19          SO WE HAVE GIVEN EXACTLY WHAT THOSE COURTS HAVE SAID
20   THAT ARE REQUIRED.  THERE ARE THEY, HERE THE BENEFICIARIES
21   ARE.  WHY ARE THEY IN LINE WITH THE CLASS?  THEY ARE INTERNET
22   PRIVACY PEOPLE.  THEY ARE COMPANIES THAT PROTECT CONSUMERS ON
23   THE INTERNET.  THEY ARE A NONPROFIT, AND THEY GET DONATIONS.
24          AND I WOULD SUGGEST TO THE COURT THAT YOU GO LOOK AT
25   THEIR WEBSITE.  YOU WILL SEE A LOT OF DIFFERENT THINGS THAT
```

1    THEY DO.  THEY ARE RAISING MONEY PRIVATELY.  THEY HAVE GOT

2    CASES THAT THEY FILED.  THEY HAVE SEMINARS THAT THEY HOLD.

3    YOU KNOW, CONSUMER EDUCATION CONFERENCES AND OTHERWISE.

4            IN FACT, I HAVE LOOKED AT THEIR WEBSITES FREQUENTLY

5    AND LOOKED AT THEM AGAIN THIS MORNING BEFORE THE HEARING JUST

6    TO SEE WHAT NEW THINGS WERE COMING OUT.

7         **THE COURT:**  HOW WOULD THESE ORGANIZATIONS AND THEIR

8    INTERNET POLICING SERVE AS A DETERRENT TO GROUPON OR FURTHER

9    THE PURPOSES OF THE INTEREST OF THE PLAINTIFFS CLASS IN THIS

10   PARTICULAR CASE AS THIS IS A CARD ACT BASED CASE?

11        **MR. STOIA:**  WELL, THEY DON'T FOCUS SPECIFICALLY ON

12   THE CARD ACT.  AND SOME OF THE CONSUMER ORGANIZATIONS THAT I

13   BELIEVE MR. GRENVILLE MENTIONED, THEY ARE NOT SPECIFICALLY A

14   CARD ACT TYPE ORGANIZATION.

15           THEY ARE MUCH MORE BROADER IN MAINTAINING INTERNET

16   SECURITY, SAFETY, ROBUST E-COMMERCE AND OTHERWISE FOR THE

17   COMMON USER.  FROM THE MOMENT YOU LOG ON THEY ARE PROTECTING,

18   AS PART OF THEIR WORK, YOUR RIGHTS AS AN INTERNET USER.  AND

19   THEN PUTTING YOU TO -- MAKING SURE THAT YOUR INTERNET

20   CONNECTION IS SAFE, YOU ARE NOT BEING SPIED ON BY NOT JUST THE

21   GOVERNMENT, BUT IF YOU LOOK AT THEIR WEBSITE BY COMMERCIAL

22   ENTITIES AND COMPANIES AND OTHERWISE.

23           SO IN ANSWER TO YOUR QUESTION, YOUR HONOR, DOES IT

24   SPECIFICALLY SAY EFF, THAT WE DEAL WITH CARD ACT ISSUES AND

25   THAT IS WHAT WE ARE PROMOTING?  NO, IT DOES NOT.  THAT IS NOT

1    TRUE FOR EITHER EFF OR FOR THE CENTER FOR DEMOCRACY AND

2    TECHNOLOGY.

3           HOWEVER, THERE DOESN'T HAVE TO BE A DIRECT ALIGNMENT

4    BETWEEN THE CY PRES RECIPIENT, THERE JUST HAS TO BE AN

5    ALIGNMENT OF INTEREST.

6           AND TAKEN TO THE LOGICAL CONCLUSION OFFERED BY THE

7    OTHER OBJECTORS, THAT MEANS THAT IF I WERE TO DO A SMALL CY

8    PRES FOR THE BENEFIT OF THIS CLASS -- AND THAT IS ONLY IF THEY

9    ALL GET THEIR MONEY BACK.  IT ISN'T LIKE FACEBOOK, $10 MILLION

10   UP FRONT, YOU KNOW, TO UNKNOWN RECIPIENTS.  $75,000 AFTER THEY

11   GET PAID THEIR REFUNDS.

12          IF I TAKE THEIR ARGUMENT, THEN I HAVE TO FIND A

13   NATIONAL ASSOCIATION FOR CARD ACT FRAUD PREVENTION, A NATIONAL

14   ASSOCIATION FOR THE, YOU KNOW, 17200 AND 17500 LEGAL THEORY

15   FOUNDATION, YOU FIND THAT AMOUNT OF SPECIFICITY IS NOT

16   REQUIRED.

17          IF YOU LOOK AT THE AOL OPINION, YOUR HONOR -- AND I

18   THINK IT IS NATIONAL VERSUS AOL.  I COULD QUOTE TO YOU FROM

19   THAT OPINION, BECAUSE I THINK IT IS VERY TELLING ABOUT THE

20   ALIGNMENT BETWEEN COUNSEL -- OR BETWEEN CLASS MEMBERS AND

21   BETWEEN THE CLASS AND WHAT -- DOES THERE HAVE TO BE, FOR

22   EXAMPLE, YOUR HONOR, DIRECT PRIVILEGE, DOES IT HAVE TO BE

23   PERFECT.

24          AND HERE IS WHAT THE NACHSHIN COURT SAID WHEN THEY

25   WERE TELLING -- THEY WERE TELLING -- THEY WERE TELLING THE

```
 1    SETTLING PARTIES.

 2           AND MR. FRANK, I BELIEVE, WAS IN THIS CASE, SO HE

 3    WILL KNOW WHAT THE COURT SAID IN THE OPINION.

 4           IN THAT CASE THEY WERE JUST GOING TO GIVE IT TO SOME

 5    LOS ANGELES AREA CHARITIES.  RIGHT?  EVEN THOUGH THE CLASS WAS

 6    NATIONWIDE.  THE COURT REJECTED THAT.

 7           THE OTHER ONE WAS THE FEDERAL JUDICIAL CENTER.

 8           AND THE COURT GAVE GUIDANCE AND THEY SAID, AND I,

 9    QUOTE:  IT IS CLEAR THAT ALL MEMBERS OF THE CLASS SHARE TWO

10    THINGS IN COMMON.  THEY USE THE INTERNET.

11           RIGHT?  JUST LIKE THE PEOPLE HERE.

12           AND THE CLAIMS AGAINST AOL ARISE FROM PURPORTEDLY

13    UNLAWFUL ADVERTISING CAMPAIGN THAT EXPLOITED THE USERS'

14    OUTGOING E-MAIL MESSAGES.

15           NOW, THE COURT DIDN'T SAY YOU HAVE TO GO FIND A

16    SPECIFIC ADVERTISING CY PRES RECIPIENT.  IT SAID, QUOTE:  THE

17    PARTIES SHOULD NOT HAVE TROUBLE SELECTING BENEFICIARIES FROM

18    ANY NUMBER OF NONPROFIT ORGANIZATIONS THAT WORK TO PROTECT

19    INTERNET USERS FROM FRAUD, PREDATION AND OTHER FORMS OF ONLINE

20    MALFEASANCE.

21           AND THAT IS WHAT WE DID.  WE PICKED EFF, CENTER FOR

22    DEMOCRACY AND TECHNOLOGY.  A DE MINIMUS AMOUNT BY ANY

23    STANDARD.  IT IS LESS THAN 1 PERCENT OF THE CLASS, IF WE EVEN

24    GET THERE.

25                 THE COURT:  GOING BACK TO THAT FIRST ISSUE OF THE
```

48

```
 1    $75,000 CARVE OUT IF THERE IS A FUND TWO.  IF, AS YOU SAY,

 2    THERE MAY BE MANY MORE CLAIMS THAN THE OBJECTORS INDICATE AND

 3    THE TIER ONE MAY BE HEAVILY USED AND THERE IS NOT A LOT OF

 4    MONEY LEFT IN THE TIER TWO FUND, SHOULDN'T IT FIRST GO TO THE

 5    CLASS MEMBERS?

 6            MR. STOIA:  YOUR HONOR -- AND I HAVE TO SPEAK WITH

 7    MS. WEISS ABOUT THAT.

 8            BUT IF WHAT THE COURT IS SUGGESTING IS THE WAY --

 9    THE PROCEDURE TO DO IT A LITTLE BIT DIFFERENTLY THAN WHAT WE

10    SET UP.  IT WOULD BE FIRST CLAIM FUND.  IF THERE IS ANY MONEY

11    LEFT OVER IT GOES TO THE SECOND CLAIM FUND.  AND THEN IF THERE

12    IS ANY MONEY LEFT OVER AFTER THAT THEN IT WOULD GO TO THE CY

13    PRES RECIPIENTS.

14            IS THAT WHAT THE COURT IS SUGGESTING?

15            THE COURT:  YES.

16            MR. STOIA:  THAT IS THE COURT'S IDEA.  I WOULD NOT

17    HAVE A PROBLEM WITH THAT.  NOW, WHETHER -- I CAN'T SPEAK FOR

18    MS. WEISS.

19            BUT IF YOU WANTED TO TAKE AND BASICALLY MOVE THE

20    $75,000 TO THE END, FIRST FUND IS PAID, SECOND FUND IS PAID,

21    AND THEN IF THERE IS ANY MONEY LEFT IT GOES TO -- TO SPLIT IT

22    BETWEEN THE TWO.  I, ON BEHALF OF THE CLASS, DO NOT HAVE A

23    PROBLEM WITH THAT, YOUR HONOR.  SO I AM FINE WITH WHAT THE

24    COURT IS SUGGESTING, IF THAT IS IN FACT WHAT YOU ARE

25    SUGGESTING.
```

49

```
 1          THE COURT:  ANY OTHER SPECIFIC COMMENTS TO THE
 2   OBJECTORS' POINTS?
 3          MR. STOIA:  LET ME SEE, YOUR HONOR, LET'S SEE WHO
 4   HAS SPECIFIC POINTS.  I MEAN, THERE IS A LOT OF COMMENTS.  I
 5   THINK I ADDRESSED MOST OF THEM.  BUT IF I MAY HAVE JUST ONE
 6   MOMENT, AND THEN I WILL LET MS. WEISS SPEAK AS TO THE GAP
 7   ISSUE.
 8          THE COURT:  ALL RIGHT.
 9          MR. STOIA:  ONE OF THE THINGS, YOUR HONOR, IS THAT
10   THEY WERE TALKING ABOUT HOW THE VOUCHERS NOW SAY THAT, YOU
11   KNOW, NEVER EXPIRES, YOUR CUSTOMER PAID IN PRICE.  RIGHT?  YOU
12   PAY 50, YOU GET 100, THE 50 NEVER EXPIRES.
13          YOU KNOW WHY THAT IS?  BECAUSE THEY DID THAT AFTER
14   WE SUED THEM.  AND ONE OF THE PARTS OF THE SETTLEMENT WAS THEY
15   WERE GOING TO REVISE THEIR VOUCHER.  IF YOU LOOK AT THE
16   STIPULATION OF SETTLEMENT IT SAYS THAT GROUPON IS GOING TO
17   REVISE THEIR VOUCHER TO SEPARATE OUT PAID IN VALUE, NONPAID IN
18   VALUE.  THAT IS THE NEW VOUCHER.  I HAVE THE VOUCHER IF THE
19   COURT WOULD LIKE TO SEE IT.  THAT IS BECAUSE WE SUED THEM, AND
20   THAT WAS PART OF OUR SETTLEMENT NEGOTIATIONS.  THAT IS IN THE
21   STIP.
22          AGAIN, WITH DUE RESPECT TO COUNSEL FOR THE
23   DEFENDANTS, THEY DIDN'T DO IT OUT OF THE GOODNESS OF THEIR
24   HEART.  SO THAT IS WHY IT IS DIFFERENT NOW.  WE DID THAT; NOT
25   THEM.
```

```
 1              THE STATUTORY DAMAGES, YOUR HONOR.  YOU HAVE BEEN ON
 2   THE BENCH LONG ENOUGH, I HAVE PROSECUTED ENOUGH OF THESE
 3   CASES.  IT IS KIND OF LIKE WHAT MY -- WHAT MY CIVIL PROCEDURE
 4   PROFESSOR TOLD ME, THAT IF I EVER START WITH A PUBLIC POLICY
 5   ARGUMENT AS MY FIRST ARGUMENT I SHOULDN'T BE TALKING AT ALL.
 6   IT IS THE SAME AS A PLAINTIFF'S LAWYER.  IF I COME IN AND MY
 7   STRONGEST ARGUMENT IS STATUTORY DAMAGES, I AM IN TROUBLE.  I
 8   HAVEN'T SEEN A STATUTORY DAMAGES CASE IN A LONG TIME.  THAT
 9   WAS WHAT WAS BEING PAID OUT.
10              WHAT COUNSEL MISSES ON THE CARD ACT, THEY DON'T TELL
11   YOU, IS TWO THINGS.  ONE IS THEY STRENUOUSLY ARGUE THAT IT IS
12   NOT SUBJECT TO THE CARD ACT.  I HAVE HEARD THAT ARGUMENT MORE
13   TIMES THAN I CARE TO MENTION BOTH IN MEDIATION AND OTHERWISE
14   FROM MS. WEISS AND HER CO-COUNSEL.
15              THAT IS THE FIRST THING.
16              ALSO, THE CARD ACT HAS A $500,000 CAP ON HOW MUCH
17   CAN BE PAID IN A CLASS ACTION.  IT IS IN THE STATUTE.  READ
18   IT.  NOT YOU, YOUR HONOR, THEM.  I KNOW YOU HAVE READ IT.
19              BUT THAT IS IT.  SO 8 1/2 MILLION, 500,000 STATUTORY
20   DAMAGES IF THERE IS A COURT THAT WOULD ACTUALLY EVER AWARD
21   STATUTORY DAMAGES.  I AM NOT AWARE OF THAT MANY.  I ALWAYS
22   THINK OF THE FLEETBOSTON CASE OUT OF CHICAGO WHEN THAT COMES
23   TO MIND.
24              THE INJUNCTIVE RELIEF.  YOU KNOW WHY WE DIDN'T APPLY
25   VALUE TO IT, YOUR HONOR?  WE DIDN'T NEED TO.  WE HAVE $8 1/2
```

```
1    MILLION HERE.  WE ARE APPLYING FOR 25 PERCENT OF A CASH
2    AMOUNT.  THIS CASE, I AM UNDERWATER.  I AM LOSING 30 PERCENT.
3    MY FEES TO DATE ARE 3.1 MILLION, I AM ONLY ASKING FOR 2.1.  I
4    DON'T NEED TO COME UP WITH, YOU KNOW, NUMBERS FOR THE
5    INJUNCTIVE RELIEF.  IT IS WHAT IT IS.
6            THE INJUNCTIVE RELIEF IS A THREE-YEAR BAN FROM NO
7    EXPIRATION ON THEIR VOUCHERS.  CHANGING THE RELIEF.  NOW
8    GROUPONS ARE FULLY TRANSFERABLE, WHICH WAS AN ISSUE BEFORE.
9    YOU BUY ONE, YOU WANT TO GIVE IT TO A FAMILY MEMBER OR
10   SOMEBODY ELSE, GO RIGHT AHEAD.  THEY ARE NOW FULLY
11   TRANSFERABLE AS PART OF THE SETTLEMENT.
12           I DIDN'T NEED TO GO GET SOMEBODY TO VALUE THE
13   INJUNCTIVE RELIEF, IT WASN'T NECESSARY.  AND I AM NOT ASKING
14   FOR A FEE ON THAT.  IF I WAS GOING TO ASK FOR A FEE ON IT I
15   WOULD COME IN WITH A VERY HIGH VALUE, YOU WOULD EXPECT, AND
16   ASK FOR IT.  WE DID NOT DO THAT.  WE WERE NOT TRYING TO PLAY
17   ANY GAMES WITH THE SETTLEMENT.
18           THE SETTLEMENT IS REAL.  IT IS REAL MONEY FOR CLASS
19   MEMBERS.  THEY GET CASH, THEY GET MADE WHOLE.  GOT EXPIRED
20   GROUPON, THEY DON'T HONOR IT, YOU GET YOUR MONEY BACK PLUS THE
21   KICKER.  YOU DON'T HAVE THAT, YOU GET TO CLAIM INTO THE FUND
22   FOR ANY REASON WHATSOEVER TO COME IN AND BRING IT AND DO ALL
23   OF THAT.
24           AND YOU KNOW WHAT?  IF ANY ONE OF THESE CLASS
25   MEMBERS -- 48,000 RIGHT NOW WHO HAVE FILED, AND WE BELIEVE A
```

1  LARGE MAJORITY ARE GOING TO FILE IN THE FUTURE -- DIDN'T HAVE

2  THIS LAWSUIT, THEY WOULD GET ZERO.  WHY IS THAT?  CONCEPCION,

3  COMPUCREDIT AND OTHERWISE.  THEIR ARBITRATION CLAUSE IS

4  WRITTEN, AND NOW THEY REWROTE IT, AS YOU CAN IMAGINE, TO MAKE

5  IT EVEN BETTER.  NOT ONLY HAS INDIVIDUAL MANDATORY ARBITRATION

6  BUT IT HAS A CLASS ACTION WAIVER.  AND BOTH HAVE BEEN UPHELD

7  BY THE SUPREME COURT AND NOW THE CALIFORNIA COURT OF APPEALS

8  HAS UPHELD THAT.

9           SO WE GOT THEM $8 1/2 MILLION VERSUS ZERO.  IF THEY

10  WANT TO CALL GROUPON AND SAY HEY, WE HAVE AN EXPIRED DEAL, WE

11  DON'T HAVE THAT SETTLEMENT ANYMORE, HONOR THAT GROUPON

12  PROMISE; THAT IS NOT GUARANTEED.  WHAT WE DID ON BEHALF OF THE

13  CLASS, THAT IS GUARANTEED.

14           THANK YOU, YOUR HONOR.

15       **THE COURT:**  LET ME INQUIRE OF MS. WEISS, PICKING UP

16  ON THE ARBITRATION WAIVER POINT.

17           IT WAS ARGUED BY MR. BULGARELLI ON BEHALF OF

18  MR. SPENCER THAT IN ILLINOIS THE GROUPON ARBITRATION WAIVER

19  MIGHT APPLY BETWEEN THE CONSUMER AND GROUPON BUT IT WOULD NOT

20  INVOLVE, IN THE ILLINOIS CASE, GAP OR ANY ONE OF THE

21  PROVIDERS.

22       **MS. WEISS:**  YES, YOUR HONOR.  I DON'T KNOW THAT HE

23  MADE THAT ARGUMENT IN THE PAPERS, SO I AM NOT SURE THAT I

24  ADDRESSED THAT SPECIFICALLY.

25           I THINK THAT THE -- THERE IS LAW TO THE EFFECT THAT

```
 1    WHEN THERE IS AN ARBITRATION AGREEMENT BETWEEN, YOU KNOW, TWO
 2    PRINCIPALS THAT IF THERE IS A SATELLITE RELATIONSHIP THAT
 3    SATELLITE RELATIONSHIP IS SUBSUMED WITHIN THE ARBITRATION
 4    AGREEMENT.  AND SO I THINK THAT LIKELY WOULD APPLY, BUT I
 5    CAN'T SAY THAT FOR SURE.  I THINK THERE ARE, YOU KNOW, OTHER
 6    REASONS TO OVERRULE THAT OBJECTION.
 7            BUT IN TERMS OF THE ARBITRATION CLAUSE -- YOU KNOW,
 8    I WILL SAY THAT THE REASON THAT WE, AS PART OF THIS
 9    SETTLEMENT, CONSTRUCTED A SETTLEMENT THAT ALSO IMPACTED THE
10    MERCHANT PARTNERS IS BECAUSE IF THE MERCHANT PARTNERS ARE LEFT
11    OUT OF THIS SETTLEMENT WE HAVE NO DOUBT BUT THAT GROUPON IS
12    GOING TO END UP BEING BROUGHT IN AS A THIRD PARTY BY THE
13    MERCHANT PARTNERS BECAUSE THEY WOULD BE PART OF THE
14    LITIGATION, INDISPENSABLE.  THERE MAY BE INDEMNIFICATION
15    OBLIGATIONS.  AT THE END OF THE DAY GROUPON WOULD NEVER BUY
16    ITSELF ANY PEACE AT ALL UNLESS IT BOUGHT PEACE FOR ITS
17    MERCHANT PARTNERS.
18            SO THAT WAS A BASIC UNDERSTANDING BETWEEN US AND THE
19    PLAINTIFFS IN SITTING DOWN FROM THE VERY FIRST THAT THE
20    MERCHANT PARTNERS HAVE TO BE PART OF THIS SETTLEMENT WHETHER
21    OR NOT THEY ARE NAMED PARTIES BECAUSE WE ARE JUST GOING TO BE
22    BACK IN HUNDREDS OF LAWSUITS AND HUNDREDS OF ARBITRATIONS IF
23    THEY ARE NOT.
24            SO THE THINKING BEHIND THE SETTLEMENT IS PEACE FOR
25    GROUPON, PEACE FOR ITS MERCHANT PARTNERS.  AND YES, IF WE ARE
```

```
 1    FORCED TO MOVE ON THE ARBITRATION CLAUSE WE ARE GOING TO MOVE
 2    ACROSS THE BOARD WITH RESPECT TO ALL DISPUTES.
 3            SO, YOUR HONOR, IF YOU WILL PERMIT ME, I GUESS I
 4    WOULD LIKE TO BACK UP A COUPLE OF STEPS AND MAKE SOME
 5    COMMENTS, REALLY, ON ALL OF THE OBJECTORS' POSITIONS.
 6            FIRST OF ALL, SOME OF THIS THE COURT ALREADY KNOWS,
 7    BUT JUST TO START -- TO BACK UP A STEP AND SET THE TABLE, IF
 8    YOU WILL.
 9            GROUPON IS A RELATIVELY YOUNG COMPANY AND IT IS AN
10    INNOVATIVE COMPANY.  IT WAS BORN, BASICALLY, IN 2008 AND WENT
11    PUBLIC LAST YEAR.  AND IT IS, YOU KNOW, THE GREAT SPIRIT OF
12    AMERICAN INNOVATION.  WHAT IT DID WAS TO COMBINE TRADITIONAL,
13    OLD-FASHIONED, TRIED AND TRUE MARKETING IDEAS WITH NEW
14    CONCEPTS, NEW WAYS OF COMMUNICATION AND THE INTERNET.
15            AND IT WAS SO SUCCESSFUL, IT WAS SO WELL RECEIVED BY
16    CONSUMERS, BY MERCHANTS AND BY STATES BECAUSE IT CREATED JOBS
17    EVERYWHERE, THAT IT BECAME THE FASTEST GROWING COMPANY IN
18    HISTORY.
19            AND IT WAS NOT ONLY THE FASTEST GROWING COMPANY IN
20    HISTORY BUT IT WAS ALSO THE MOST FLATTERED COMPANY IN HISTORY,
21    IF THE OLD SAYING IS TRUE THAT THE BEST FORM OF FLATTERY IS
22    IMITATION, BECAUSE IT CREATED A WHOLE INDUSTRY OF COPYCATS.  I
23    MEAN, EVERYWHERE NOW, IF YOU GO ON THE INTERNET THERE IS
24    AMAZON, THERE IS LIVING SOCIAL.  THERE IS A PLETHORA OF
25    COMPANIES THAT HAVE SPECIFICALLY FOLLOWED THE GROUPON PIONEER
```

1    MODEL.

2          AND WHAT IS THAT MODEL?  THAT MODEL ESSENTIALLY IS

3    TO TAKE THE PRACTICE OF MERCHANTS TO GIVE A DEEP DISCOUNT, OR

4    TWO FOR THE PRICE OF ONE.  HERE IS A LIMITED TIME ONLY SPECIAL

5    PROMOTIONAL OFFER.  WE ARE GOING TO GIVE YOU A VOUCHER THAT

6    YOU PAY $25 FOR THAT IS WORTH $50.  THAT IS 100 PERCENT VALUE

7    ADDED.  WHERE?  AT A PLACE THAT YOU WANT TO GO:  NORDSTROM,

8    THE GAP, OR SOME LITTLE COMPANY YOU NEVER HEARD OF THAT JUST

9    HAPPENS TO DO BUSINESS THREE STREETS AWAY FROM YOUR NEAREST

10   FAVORITE RESTAURANT.

11          IT IS A CONCEPT THAT WAS SO SUCCESSFUL, THAT TOOK

12   OFF SO IMMEDIATELY, PEOPLE WERE SIGNING UP TO BELONG TO ITS

13   DATABASE BY THE THOUSANDS, BY THE HUNDREDS OF THOUSANDS.

14          AND WHAT DID THEY GET IN RETURN?  WELL, THEY WERE

15   REQUIRED TO ENTER INTO AN AGREEMENT WITH GROUPON.  AND THE

16   AGREEMENT SPELLED OUT, ESSENTIALLY, LOOK, YOU ARE DOING

17   BUSINESS WITH US.  THERE IS A LIMITED AMOUNT OF REAL ESTATE ON

18   THESE VOUCHERS.  BUT IF YOU ARE ENTITLED BY LAW TO A LONGER

19   TIME PERIOD THAN THE EXPIRATION DATE THAT WE SHOW, WELL, THEN

20   YOU NEED TO CONSULT THE LAW.  OBVIOUSLY WE CAN'T PUT 50

21   STATES' LAWS ON A GROUPON VOUCHER.

22          SO THE GROUPON MODEL, ESSENTIALLY, WAS WE ARE GOING

23   TO STATE THE EXPIRATION DATE OF THE PROMOTIONAL OFFER.  THIS

24   IS FROM THE MERCHANT.  THE MERCHANT DOESN'T WANT A PERPETUAL

25   PROMOTION, OBVIOUSLY.  WE ARE GOING TO STATE THIS DATE.  AND

```
1    IF YOU HAVE SOME OTHER RIGHTS, WELL, YOU SIGNED AN AGREEMENT
2    WITH US THAT YOU ARE AWARE THAT THERE MAY BE SOME OTHER
3    RIGHTS.  GO AND CONSULT WHOEVER YOU CONSULT WITH RESPECT TO
4    YOUR STATE.
5            AND REMEMBER, THESE COMPANIES THAT GROUPON PARTNERED
6    WITH, THESE MERCHANT PARTNERS, THEY HAD BEEN IN THE BUSINESS
7    OF ISSUING GIFT CERTIFICATES LONG BEFORE GROUPON WAS ANYBODY'S
8    IDEA.  SO IF YOU HAVE A NORDSTROM, THEY HAVE GOT A GIFT
9    CERTIFICATE POLICY.  GAP, THEY HAVE GOT A GIFT CERTIFICATE
10   POLICY.  SO FOR GROUPON, A BRAND NEW COMPANY, TO SAY GO AND,
11   YOU KNOW, CONSULT WITH YOUR MERCHANT PARTNER, GO LOOK AT THE
12   LAW.  THAT IS A REASONABLE THING TO DO AND OTHER COMPANIES DID
13   IT AS WELL.
14           BUT, SURE ENOUGH, THE COMPANY GOES INTO BUSINESS.
15   IT IS HUGELY SUCCESSFUL.  MR. STOIA AND SEVERAL PLAINTIFFS
16   SUED, AND THEY SAID A NUMBER OF THINGS.  BUT ONE OF THE THINGS
17   THEY SAID WAS WE THINK YOUR VOUCHER IS CONFUSING.  HOW ARE
18   PEOPLE SUPPOSED TO KNOW THAT THERE IS AN EXPIRATION DATE FOR
19   THE PROMOTIONAL VALUE.  THERE MIGHT BE A SEPARATE EXPIRATION
20   DATE FOR THE PURCHASE VALUE.
21           SO ALTHOUGH IT HAS BEEN GIVEN SUCH SHORT SHRIFT,
22   VIRTUALLY INSULTED BY THE OBJECTORS, WE THOUGHT THE INJUNCTIVE
23   RELIEF WAS A HUGE DEAL.  AND IT BENEFITS THE CLASS OF PEOPLE
24   THAT IS BASICALLY A COMMUNITY HERE, BECAUSE THE GROUPON
25   SUBSCRIBER BASE IS A COMMUNITY.  THEY GET THEIR GROUPON DAILY
```

57

```
 1    DEAL NOTICES EVERY DAY.  THEY CAN OPT OUT -- I AM SORRY --
 2    THEY CAN UNSUBSCRIBE ANY TIME THEY CHOOSE, BUT THEY DON'T.  I
 3    MEAN, THEY JUST GO IN AND PURCHASE GROUPON AFTER GROUPON.  AND
 4    WHO WOULDN'T?  WHO WOULDN'T WANT TWO FOR THE PRICE OF ONE,
 5    ANYWAY?
 6             SO WHAT MR. STOIA SAID WAS ONE OF THE THINGS THAT WE
 7    WANT IS WE WANT YOU TO CLARIFY THOSE VOUCHERS.  AND, BY THE
 8    WAY, WE WOULD LIKE YOU TO HAVE THEM NOT EXPIRE.
 9             WELL, THERE IS A NUMBER OF STATES THAT HAVE NO
10    PROHIBITION WHATSOEVER AGAINST EXPIRATION OF GIFT CARDS, EVEN
11    ASSUMING THAT A GROUPON IS A GIFT CARD.  AND I WILL GET TO
12    THAT IN A MINUTE.
13             SO FOR US TO SAY OKAY, FOR THREE YEARS WE ARE GOING
14    TO TAKE THIS CLASS OF PEOPLE, THIS GROUP OF SUBSCRIBERS,
15    THOUSANDS AND THOUSANDS, MILLIONS OF SUBSCRIBERS THAT HAVE
16    SIGNED UP AND WE ARE GOING TO SAY IT DOESN'T MATTER WHAT STATE
17    YOU LIVE IN.  IT DOESN'T MATTER IF YOU HAVE STATES THAT HAVE A
18    ONE-YEAR PROHIBITION, A FIVE-YEAR PROHIBITION, NO PROHIBITION,
19    30 DAYS.  OREGON HAS 30 DAYS ONLY.  WE ARE GOING TO HAVE, FOR
20    THREE YEARS, UNTIL THE LAW SORTS ITSELF OUT -- BECAUSE THE LAW
21    IS ALL OVER THE MAP -- NO EXPIRATION.
22             AND, YOU KNOW, MAYBE THAT PUTS US AT A COMPETITIVE
23    DISADVANTAGE; MAYBE IT DOESN'T.  MAYBE PEOPLE FOLLOW US.  BUT
24    THAT WAS SOMETHING THAT WAS NEGOTIATED IN THE SETTLEMENT.
25    THAT IS HUGE.
```

```
1              SECONDLY, WE CLARIFIED THE VOUCHER.  THIS WAS AN
2    INTERIM PROCESS.  WE WENT BACK AND FORTH.  SOMETIMES JUDGE
3    WEINSTEIN HAD TO COME IN AND KIND OF SEPARATE THE PARTIES.  WE
4    FELT VERY STRONGLY ABOUT OUR VIEWS.  BUT WE GOT A VOUCHER
5    FORMAT THAT WE COULD AGREE ON.
6              THE OTHER THING MR. STOIA SAID TO ME IS WELL, I WANT
7    A 30-DAY MINIMUM ON YOUR VOUCHERS, OR AT LEAST MOST OF THEM.
8              WELL, IF I SAY TO A CONSUMER, LOOK, I AM GOING TO
9    GIVE YOU 100 PERCENT MORE THAN WHAT YOU ARE PAYING ME IN
10   VALUE, I AM GOING TO GIVE YOU 100 PERCENT MORE.  BUT, YOU
11   KNOW, YOU HAVE GOT TO USE IT IN THE NEXT TWO WEEKS.
12             THAT PERSON CAN SAY NO, I AM GOING TO BE TOO BUSY IN
13   THE NEXT TWO WEEKS TO DO IT; OR THEY CAN SAY YES, I WILL TAKE
14   THAT DEAL, THAT IS A GREAT DEAL.
15             SO I SAID TO MR. STOIA, WHY SHOULD WE HAVE TO PUT
16   ANY MINIMUM AMOUNT OF TIME ON OUR VOUCHERS?
17             AND HE SAID, BECAUSE I THINK IT IS A GOOD THING FOR
18   THE CLASS.
19             SO HE PUT THIS SMORGASBORD OF THINGS THAT HE WANTED
20   ON THE INJUNCTIVE RELIEF SIDE.  WE SPENT A TREMENDOUS AMOUNT
21   OF TIME ON THAT, AND I THINK MY CLIENT GAVE SOME VALUABLE
22   CONCESSIONS.
23             AND IN TERMS OF WHO DOES THIS -- THIS DOESN'T
24   BENEFIT IN THE FUTURE, THE LAWSUIT SOUGHT INJUNCTIVE RELIEF.
25   THE NATURE OF INJUNCTIVE RELIEF IS FUTURE ORIENTED.  AND SO TO
```

1   SAY THAT WE CAN'T FIX THE INJUNCTIVE PRAYER BY ENTERING INTO A

2   SETTLEMENT THAT ADDRESSES FUTURE SALES PRACTICES, FUTURE

3   BEHAVIOR, I NEVER HEARD OF SUCH A THING.  I MEAN, THAT IS WHAT

4   THE CALIFORNIA STATUTES ARE LARGELY ALL ABOUT, CHANGING SALE

5   PRACTICES.

6          SO THAT IS AN EXTREMELY IMPORTANT PART OF THE

7   SETTLEMENT.  WE NEGOTIATED IT AS PART OF THE SETTLEMENT.  IT

8   IS A BENEFIT TO THE CLASS, WHICH, AS I SAID, IT IS THE

9   SUBSCRIBER COMMUNITY.

10         A COUPLE OF MINUTES ABOUT THE CARD ACT.

11         FIRST OF ALL, THE CARD ACT -- THE PORTION OF THE

12  CARD ACT THAT HAS BEEN ADDRESSED HERE WASN'T PASSED UNTIL

13  AUGUST OF 2010.  THE CLASS IS NOVEMBER OF 2008 ALL THE WAY TO

14  DECEMBER OF 2011.  SO THERE IS A LARGE PORTION OF THE CLASS

15  AND THE CLASS PURCHASES THAT THE CARD ACT DOESN'T APPLY TO

16  BECAUSE IT WASN'T PASSED AT THE TIME, SO THERE IS NO QUESTION

17  THAT THE CARD ACT DOESN'T APPLY TO THAT.

18         WHAT ABOUT THE OTHERS?  THERE IS A VERY HARD FOUGHT

19  DISPUTE ABOUT THE APPLICATION.  THE CARD ACT HAS A VERY

20  PRONOUNCED EXCEPTION FOR PROMOTIONS.  THESE ARE CLEARLY

21  PROMOTIONS.  I MEAN, IF YOU GET A COUPON THAT SAYS YOU CAN GET

22  100 PERCENT MORE VALUE THAN WHAT YOU ARE PAYING BUT IT IS

23  SPECIAL LIMITED TIME, IT IS A PROMOTION.  SO WE THINK IT FALLS

24  OUTSIDE OF THE CARD ACT.  IF IT FELL INSIDE THE CARD ACT THERE

25  IS A STATUTORY LIMITATION ON DAMAGES FOR CLASS ACTIONS, IT IS

```
 1    500,000.

 2            NOW, MR. STOIA MAY LITIGATE THAT, HE MAY DISAGREE

 3    WITH THAT, BUT WE THINK IT IS A $500,000 CAP.  THERE IS NO

 4    CAP -- WELL, THERE IS A CAP ON INDIVIDUAL ACTIONS, I THINK IT

 5    IS $100 PER PERSON, BUT THIS IS NOT AN INDIVIDUAL ACTION, IT

 6    IS A CLASS ACTION.

 7            AS TO THE OBJECTORS, ONE OF THESE GENTLEMAN ARGUED

 8    THAT WELL, THERE SHOULD HAVE BEEN SOMETHING IN THE NOTICE

 9    ABOUT THIS MINIMUM FOR AN INDIVIDUAL ACTION OF $100.  WHY?

10    THAT IS DISPUTED.  THAT WOULD BE MISLEADING TO IMPLY TO THE

11    CLASS THAT THEY MIGHT -- IF THEY HOLD OUT THEY MIGHT GET $100,

12    BECAUSE IT IS VERY HOTLY DISPUTED.

13            SO THE CARD ACT WAS A COMPROMISE.  IT WAS PART OF

14    THE GREAT COMPROMISE.

15            AS FAR AS THE CY PRES IS CONCERNED, MR. STOIA REALLY

16    SPOKE FOR ME.  ACTUALLY I HAVE SAID UNDER OATH OUR FIRM HAD

17    NOTHING TO DO WITH CHOOSING EITHER OF THE CY PRES RECIPIENTS.

18    OUR CLIENT HAPPENED TO SUGGEST ONE, MR. STOIA HAPPENED TO

19    SUGGEST THE OTHER.

20            MY ONLY MARCHING ORDERS WAS MAKE SURE IT IS NOT A

21    PLAINTIFF'S RUN ORGANIZATION, AND THE ORGANIZATIONS THAT HAD

22    BEEN SUGGESTED BY THE OBJECTORS ARE PLAINTIFF FUNDED

23    ORGANIZATIONS.  SO YOU CAN UNDERSTAND WHY GROUPON WOULD NOT

24    WANT TO CONTRIBUTE TO THAT.  AND DEFINITELY DID NOT SEE IT AS

25    CONTRIBUTING TO AN ORGANIZATION THAT PROVIDES DETERRENCE TO
```

1    PEOPLE LIKE GROUPON.  THE LAST THING I THINK WE WOULD WANT TO

2    DO IS DETER THE KIND OF INNOVATION THAT GROUPON BROUGHT TO

3    THIS COUNTRY.

4            SO THE CY PRES WAS WELL INTENTIONED.  IT IS AMONG

5    THE SMORGASBORD OF THINGS THAT MR. STOIA SUGGESTED TO ME.

6    LET'S DO THIS INJUNCTIVE FIX.  LET'S PROVIDE A MONETARY

7    REMEDY.  LET'S BENEFIT AN ORGANIZATION THAT LOOKS AFTER

8    CONSUMERS, YOU KNOW.

9            AND AS I SAID, JUDGE WEINSTEIN THOUGHT IT WAS A GOOD

10   IDEA AND THAT IS HOW WE CAME TO THAT.  THERE IS NOTHING

11   NEFARIOUS ABOUT BENEFITING SOME ORGANIZATION THAT MY FIRM

12   REPRESENTS.  I DIDN'T EVEN KNOW THEY REPRESENT THEM UNTIL I

13   READ ABOUT IT.

14           I THINK WE MAY BE UP TO SPENCER.

15           YOU KNOW, IT IS IRONIC, YOUR HONOR.  SOME OF THE

16   OBJECTORS SAY THAT, YOU KNOW, WE HAVE BEEN THE VICTIMS OF

17   EXTORTION AND WE OVERPAID.  AND THEN OTHER OBJECTORS SAY OUR

18   SETTLEMENT IS WORTHLESS.

19           SO I GUESS YOU CAN'T PLEASE EVERYONE.  THAT SEEMS TO

20   BE THE BOTTOM LINE HERE.

21           BUT WITH RESPECT TO SPENCER, YOU KNOW, WE DIDN'T GO

22   IN THE PAPERS STATE BY STATE AND ARGUE WHY WE THOUGHT THE

23   STATE'S LAWS DIDN'T APPLY.  BUT LET ME ADDRESS SPENCER.

24           THE SPENCER PREMISE ESSENTIALLY IS THAT IF IN

25   ILLINOIS YOU ISSUE A CARD -- YOU ISSUE A VOUCHER THAT SAYS --

1    THAT YOU PAID $25 FOR AND IT SAYS ON ITS FACE IT IS WORTH $50,

2    AND IT HAS GOT CLEARLY ON IT:  THIS EXPIRES IN TWO MONTHS.

3              LET'S SAY IT IS TO A RESTAURANT.

4              HE IS SAYING BASICALLY THAT HIS CLASS IS ENTITLED

5    FOREVER, IT HAS A VESTED RIGHT AS SOON AS WE ISSUE THAT

6    VOUCHER, TO THE $50.  FORGET ABOUT WHAT THE GROUPON SAYS.

7              AND THAT IS JUST WRONG.  THAT IS JUST NOT WHAT THE

8    STATUTE INTENDED.

9              AND I AM GOING TO READ AN EXCERPT FROM THE

10   LEGISLATURE HISTORY, YOUR HONOR, WHERE THAT WILL BECOME VERY

11   CLEAR.  BUT JUST BECAUSE I SKIPPED OVER IT AND I WANT TO GO

12   BACK TO IT, THERE ARE A COUPLE OF PROCEDURAL THINGS I WANT TO

13   SAY ABOUT MR. SPENCER.

14             FIRST OF ALL, MR. SPENCER ESSENTIALLY ASKED TO BE

15   EXCLUDED.  NOW, HE CANNOT EXCLUDE OTHERS.  THOSE OTHERS HAVE

16   GOTTEN DIRECT COMMUNICATION THROUGH THEIR E-MAIL ADDRESS THAT

17   THEY SUPPLIED TO US, THEY WERE DIRECTLY CONTACTED.  A NUMBER

18   OF PEOPLE HAVE OPTED OUT, MOST PEOPLE HAVE NOT OPTED OUT.

19             THERE IS NOTHING THAT ALLOWS MR. SPENCER TO COME IN

20   HERE AND PURPORT TO ACT FOR A WHOLE BUNCH OF PEOPLE WHO HAVE

21   RECEIVED DIRECT NOTICE AND MADE THE WRONG DECISION.  HE CAN,

22   HOWEVER, ACT FOR HIMSELF.

23             AND HE HAS ASKED TO BE EXCLUDED.  I THINK THE COURT

24   OUGHT TO HONOR THAT REQUEST, EXCLUDE MR. SPENCER.  AND IF HE

25   IS EXCLUDED HE HAS GOT NO STANDING TO OBJECT.

1    **THE COURT:**  WHAT ABOUT THE OVERARCHING ARGUMENT THAT

2    MR. SPENCER MAKES THROUGH COUNSEL, AND THAT IS THAT HIS VOICE

3    SHOULD BE HEARD AS TO MANY OTHERS WHO ARE SIMILARLY SITUATED

4    IN ILLINOIS AND THERE OUGHT TO BE A CARVE OUT, FOR THAT REASON

5    THE SETTLEMENT IS FUNDAMENTALLY UNFAIR.

6    **MS. WEISS:**  YES, I AM GOING TO GET TO THE MERITS OF

7    THE OBJECTION.

8    I THINK PROCEDURALLY, THOUGH, JUST FOR THE RECORD,

9    HE CAN'T COME IN AND BOTH EXCLUDE -- OPT OUT AND OBJECT.  HE

10   HAS TO DO ONE OR THE OTHER.  SO HE HAS NO STANDING TO OBJECT.

11   HE MAY PAINT HIMSELF AS AN ALTRUISTIC PERSON OR

12   SOMEONE WHO COMES IN AND JUST WANTS TO BE HEARD ON BEHALF OF

13   THE OTHERS.  HE HAS NO STANDING.  HE HAS OPTED OUT.

14   BUT LET'S JUST PRETEND THAT HE HAD STANDING.

15   THIS NOTION THAT SOMEHOW HE HAS GOT A PERPETUAL

16   RIGHT TO THE PROMOTIONAL VALUE OF A LIMITED TIME OFFER, THAT

17   ARGUMENT, NUMBER ONE, HAS NOT BEEN MADE BY ANY OF THE ATTORNEY

18   GENERALS IN ALL OF THE STATES THAT HAVE NOTICE OF THE

19   SETTLEMENT.  AND IN PARTICULAR THE AG OF THE STATE OF

20   ILLINOIS, THE STATE THAT HE PURPORTS TO BE SPEAKING ON BEHALF

21   OF CERTAIN RESIDENTS, HAS NOT, TO US, EVER TAKEN THE POSITION

22   THAT THE PROMOTIONAL VALUE DOES NOT EXPIRE.  AND WE HAVE HAD

23   DISCUSSIONS ABOUT THE STATUTE, YOU WOULD THINK, WITH THE STATE

24   OF ILLINOIS.  SO HE IS OUT THERE ALL BY HIMSELF WITH THIS

25   NOTION.

```
1              SECONDLY, THESE LAWS, THESE OLD LAWS IN ILLINOIS
2    WERE PASSED IN CONTEMPLATION OF TRADITIONAL, OLD-FASHIONED
3    GIFT CARDS WHERE YOU PAY $25 FOR A GIFT CARD AND THAT CARD
4    OUGHT TO BE WORTH $25 IN THE STATE OF ILLINOIS FOREVER.  THAT
5    IS WHAT WAS CONTEMPLATED WHEN THESE LAWS WERE PASSED.
6              AND THE TERM "FACE VALUE," IF YOU READ THE
7    LEGISLATIVE HISTORY, MEANS THE AMOUNT THAT IS PAID BY THE
8    CONSUMER.  THAT IS WHAT THE LEGISLATURE WAS FOCUSING ON.
9              AND I WILL JUST READ YOU SOME REMARKS FROM THE
10   SENATORS, THE CONGRESSPEOPLE IN ILLINOIS.  AND FOR THE RECORD
11   I AM READING FROM THE LEGISLATIVE HISTORY OF BILL 4173, STATE
12   OF ILLINOIS, 94TH GENERAL ASSEMBLY, HOUSE OF REPRESENTATIVES.
13   IT IS A TRANSCRIPTION DEBATE.  THE 96TH LEGISLATIVE DAY,
14   FEBRUARY 21ST, 2006.  AND THIS IS CONGRESSMAN, MR. FRANKS.
15             AND HE SAYS:  THANK YOU, MR. SPEAKER.
16             HE REFERS TO HOUSE BILL 4205.
17             AND HERE IS WHAT HE SAYS, QUOTE:  THIS BILL WILL
18   TAKE AWAY THE EXPIRATION DATE AS WELL AS NOT ALLOW ADDITIONAL
19   FEES.  NOW, I THINK IT IS VERY IMPORTANT.  IF YOU GO INTO A
20   STORE AND YOU BUY A GIFT CERTIFICATE AND YOU SPEND $50, THE
21   RECIPIENT SHOULD EXPECT THAT HE IS GOING TO GET $50 WORTH OF
22   PRODUCT.  THE RECIPIENT SHOULDN'T COME BACK A FEW MONTHS LATER
23   AND FIND THAT THE CARD IS NOT WORTH $50 IT IS WORTH $30, OR IF
24   YOU MISPLACE IT AND PICK IT UP A YEAR AND A HALF LATER, FIND
25   OUT THE MONEY YOU SPENT IS NOW USELESS.
```

```
 1          SO HE IS FOCUSED ON THE TRADITIONAL GIFT CARD AND HE
 2   IS SAYING THAT NO ONE SHOULD BE ALLOWED TO TAKE WHAT YOU PAID
 3   AND SOMEHOW ERODE IT OVER TIME.  AND THAT WAS WHAT HE IS
 4   TALKING ABOUT.  HE IS NOT TALKING ABOUT THE FACE VALUE OF A
 5   PROMOTIONAL ITEM THAT COMBINES A VERY SIGNIFICANT FREEBIE WITH
 6   THE AMOUNT THAT SOMEONE PAYS.  SO JUST ON THE MERITS THE
 7   OBJECTION IS SIMPLY NOT WELL TAKEN.
 8          YOUR HONOR, AS I SAID.  MR. STOIA AND I DISAGREED
 9   ABOUT EVERY MATERIAL ISSUE IN THIS CASE.  EVERY STATUTE, EVERY
10   PIECE OF INJUNCTIVE RELIEF.  WE WERE READY TO FIGHT THIS CASE
11   FOR THE NEXT FIVE YEARS.  AND IT WAS REALLY JUDGE WEINSTEIN
12   WHO MANAGED TO SEPARATE THE PARTIES AND SAID WELL, YOU KNOW,
13   BEFORE YOU GO DOWN THAT ROAD, THINK ABOUT THIS.
14          SO REALLY I HAVE TO GIVE JUDGE WEINSTEIN CREDIT.
15          BUT THIS WAS A VERY HOTLY DISPUTED CASE, AND WE
16   CRAFTED WHAT I THINK IS A VERY GOOD SETTLEMENT FOR THE CLASS
17   THAT MY CLIENT CAN LIVE WITH.
18          NOW, I WILL SAY, CANDIDLY, THAT WE HAD AN AGREEMENT
19   IN PRINCIPLE AND THEN ALL OF THIS LAW STARTED TO COME OUT THAT
20   WAS VERY, VERY FAVORABLE SUPPORTING ARBITRATION IN CLASS
21   ACTION WAIVER.  SO, YOU KNOW, WERE THIS CASE TO FALL APART,
22   YOU KNOW, THE CLASS WOULD NOT BE -- THEY WOULDN'T BE DOING SO
23   WELL, I THINK, ON THE SECOND TIME AROUND.  BUT WE HONOR OUR
24   AGREEMENTS, AND SO WE WOULD LIKE TO HAVE THIS PUT BEHIND US.
25   GROUPON IS NOT IN THE BUSINESS OF LITIGATION.
```

```
 1              LET'S JUST SEE IF THERE IS A COUPLE MORE THINGS I

 2    NEED TO ADDRESS.

 3              AGAIN, TO MR. FRANK'S ARGUMENT.  JUST, YOU KNOW,

 4    BASICALLY, YOUR HONOR, THE INJUNCTIVE RELIEF HAS TO BE

 5    COUNTED.  THE CONTEMPLATION OF THE STATUTES IN ALL OF THESE

 6    STATES THAT MR. STOIA ASSERTED CONTEMPLATES POTENTIAL

 7    INJUNCTIVE RELIEF FOR FUTURE PRACTICES.  SO YOU CANNOT COUNT

 8    THAT AS WORTHLESS.

 9              EVEN THE EXPIRATION IN THOSE STATES THAT HAVE GIFT

10    CARD LAWS WE CHALLENGE.  WE THINK THE GROUPON IS A COMPLETELY

11    NEW AND DIFFERENT AND UNIQUE ITEM, AND THAT THESE LAWS WERE

12    NOT MEANT TO ADDRESS THE SPECIAL DEAL.  AND THAT IT IS NOT

13    ILLEGAL FOR GROUPON -- IF THIS IS HOW THE COURTS INTERPRET

14    IT -- TO SAY WE ARE WILLING TO SELL YOU A VOUCHER THAT WILL

15    GIVE YOU 100 PERCENT MORE THAN WHAT YOU ARE PAYING US, BUT OUR

16    CONDITION IS THAT IT IS GOING TO EXPIRE ON THE DATE THAT WE

17    CLEARLY SHOW.

18              WE DON'T THINK THAT IS ILLEGAL, AND WE DON'T THINK

19    THAT IS PROHIBITED BY THESE LAWS.  BUT FOR PURPOSES OF THIS

20    SETTLEMENT WE HAVE AGREED THAT FOR THREE YEARS NO ONE IS GOING

21    TO LOSE A DIME IN THE PURCHASE VALUE THAT THEY HAVE SPENT.

22              OH, THE GROUPON PROMISE.  ONE LAST THING.

23              ONCE AGAIN, TO BE CLEAR, THE GROUPON PROMISE IS --

24    IT IS A SATISFACTION GUARANTEE, IT IS NOT A RIGHT TO A REFUND.

25    IN OTHER WORDS, WHEN SOMEONE BUYS A GROUPON THEY DON'T BUY A
```

1  RIGHT TO A REFUND.  WHAT MR. STOIA NEGOTIATED WAS A RIGHT TO A

2  REFUND UNDER CERTAIN CONDITIONS.

3        AND SO, AGAIN, WE THINK THAT IS VALUABLE.  THIS IS

4  NOT SMOKE AND MIRRORS, IT IS A REAL SETTLEMENT.

5        I WILL BE QUIET NOW AND ASK THE COURT FOR FURTHER

6  QUESTIONS.

7        **THE COURT:**  WHAT ABOUT THIS 75,000 CARVE OUT IN TIER

8  TWO, DO YOU HAVE A POSITION ONE WAY OR THE OTHER?

9        **MS. WEISS:**  YOUR HONOR, AS I SAID, IT WAS SUGGESTED

10  BY MR. STOIA AMONG THE SMORGASBORD OF REMEDIES THAT HE IS

11  ACCUSTOMED TO PUTTING TOGETHER FOR HIS CLIENTS, I DIDN'T FEEL

12  STRONGLY ABOUT IT.

13        IF THE COURT BELIEVES IT IS BETTER FOR, YOU KNOW,

14  ALL CLAIMS IN TWO YEARS TO BE PAID UNDER THE SECOND SETTLEMENT

15  FUND BEFORE ANYTHING GOES TO THE CY PRES, I DON'T KNOW THESE

16  ORGANIZATIONS FROM ADAM.  AND, YOUR HONOR, I AM SURE THAT MY

17  CLIENT WOULD ACCEPT THAT IF THAT WAS THE VIEW OF THE COURT.

18        **THE COURT:**  ALL RIGHT.  OKAY.

19        WE HAVE BEEN AT THIS FOR AN HOUR AND A HALF NOW.  I

20  SEE A COUPLE OF HANDS FROM MR. FRANK AND MR. BULGARELLI.

21        I AM GOING TO, RESPECTFULLY, CLOSE THE HEARING AT

22  THIS TIME.  I HAVE A VERY FULL UNDERSTANDING OF THE OBJECTIONS

23  AND THE PARTIES' POSITIONS ON IT.

24        IT IS A VERY INTERESTING SETTLEMENT ARBITRATION, AND

25  THE OBJECTIONS WERE VERY WELL STATED.  I ENJOYED READING THE

```
 1    BRIEFS, THEY WERE SPIRITED AND ENTERTAINING.  AND THE
 2    OBJECTIONS ARE, I AM CERTAIN, BROUGHT IN IN GOOD FAITH ON
 3    BEHALF OF THE OBJECTORS.
 4            I WOULD LIKE TO CONSIDER ALL OF THE ARGUMENTS THAT
 5    HAVE BEEN MADE HERE TODAY, AND I WILL ISSUE A RULING PROBABLY
 6    WITHIN THE NEXT COUPLE OF WEEKS, I WOULD ENDEAVOR TO DO SO.
 7    THANK YOU.
 8            MR. PRIDHAM:  YOUR HONOR, I FAILED TO INFORM THE
 9    COURT.  I THINK THERE HAS BEEN A MISSTATEMENT OF THE LAW.
10    THAT $500,000 CAP, I DON'T THINK IS APPLICABLE.  DODD-FRANK
11    AMENDED THE FELA TO $1 MILLION.  AND THAT IS A WHOLE NEW
12    ARGUMENT, WHICH I WOULD LIKE TO MAKE A RECORD THAT THAT
13    UNDERSCORES THE INADEQUACY OF THE CLASS IN THIS PARTICULAR
14    CASE.
15            THE CLASS -- WITH A CAP LIKE THAT A CLASS SHOULD
16    HAVE BEEN BROUGHT UNDER THE CARD ACT, NOT AS A NATIONWIDE
17    CLASS.  IT SHOULD HAVE BEEN BROUGHT INDIVIDUALLY IN SEPARATE
18    STATES, IN EACH INDIVIDUAL STATE.  SO I WANTED TO BRING THAT
19    TO THE COURT'S ATTENTION.  AND I DID HAVE SOME COMMENTS ABOUT
20    THE CARD ACT AND WHAT THEY SAID.
21            THE COURT:  ALL RIGHT.
22            MR. BULGARELLI:  YOUR HONOR, 30 SECONDS TO CORRECT A
23    MISSTATEMENT BY MS. WEISS FOR THE RECORD.
24            THE COURT:  30 SECONDS?
25            MR. BULGARELLI:  YES.
```

69

```
 1          FIRST OF ALL, SHE SAID THAT WE ARE OF THE POSITION
 2   THAT VALUE NEVER EXPIRES.  NO.  IF YOU READ OUR BRIEFING AND
 3   THE LAW IT CLEARLY IS A FIVE-YEAR PERIOD, WHAT I SAID IN MY
 4   ARGUMENT.  SO WHERE THEY ARE GETTING THAT WE ARGUE IT NEVER
 5   EXPIRES, I SIMPLY DON'T KNOW WHERE THAT COMES FROM.
 6          SECOND OF ALL, THEY HAVE NEVER ADDRESSED THE
 7   FUNDAMENTAL PART OF THIS WHOLE THING.  OURS IS DIFFERENT THAN
 8   THE PROMISE ISSUE.  WE HAVE IT ON ITS TERMS.  IT SAYS YOU GET
 9   THIS GIFT CARD THAT IS GOOD 2500 AND THAT WOULD BE -- $25 AND
10   THAT WOULD BE FIVE YEARS.  SO AS TO WHAT THE LIKELY RECOVERY
11   WOULD BE, THAT WOULD BE THE EASIEST BREACH OF CONTRACT CASE
12   EVER.
13          AND THIS HAS NEVER BEEN ADDRESSED BY COUNSEL, AND
14   THEY ARE STICKING BY THAT IT IS NOT A GROUPON, YOU CAN READ
15   THE LAW FOR ITSELF.  BUT THAT IS ON THE TERMS AS A CONTRACTUAL
16   RELATIONSHIP THAT IS SEPARATE.
17          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU VERY MUCH,
18   HAVE A GOOD WEEKEND.
19          MR. STOIA:  THANK YOU.
20          MS. WEISS:  THANK YOU.
21                      *   *   *
22          I CERTIFY THAT THE FOREGOING IS A CORRECT
             TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
23           IN THE ABOVE-ENTITLED MATTER.
24           S/LEEANN PENCE                      9/27/2012
25           LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
```